**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL DESROCHERS; STEVE
LOWES,
             *Plaintiffs-Appellants,*

                v.

CITY OF SAN BERNARDINO; MICHAEL
BILLDT; FRANK MANKIN,
individually and as Assistant Chief
of Police for the San Bernardino
Police Department; BRIAN BOOM,
individually and as a Lieutenant
for the San Bernardino Police
Department,
             *Defendants-Appellees.*

No. 07-56773

D.C. No.
CV-06-01408-VAP

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Magistrate Judge, Presiding

Argued and Submitted
March 5, 2009—Pasadena, California

Filed July 13, 2009

Before: Diarmuid F. O'Scannlain, Pamela Ann Rymer, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Wardlaw

**COUNSEL**

Michael A. McGill, Lackie & Dammeier APC, Upland, California, argued the cause for the plaintiffs-appellants and filed the briefs.

James A. Odlum, Mundell, Odlum & Haws, LLP, San Bernardino, California, argued the cause for the defendants-appellees and was on the brief. James Penman, City Attorney's Office, San Bernardino, California, was also on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether police officers' complaints about their supervisors' conduct may give rise to a constitutional violation.

I

A

Michael Desrochers and Steve Lowes have been members of the San Bernardino Police Department ("SBPD") for over twenty years. At the time the events at issue in this case occurred, Desrochers was the sergeant in charge of the SBPD Homicide Unit, while Lowes commanded the SBPD Multiple Enforcement Team (the "Gang Unit").

On June 23, 2006, Desrochers was transferred from the Homicide Unit to the Robbery Unit, an action he viewed as a demotion. Meanwhile, Lowes was the subject of an internal affairs investigation pertaining to an April 27, 2006, arrest. At the conclusion of the investigation, Lowes received a two-week suspension. The parties hotly contest the reasons for these employment actions. The City argues Desrochers was transferred for botching a murder investigation and Lowes was suspended for disobeying orders and endangering a suspect in custody. Desrochers and Lowes claim that both the transfer and the suspension amounted to retaliation for engaging in constitutionally protected speech, as detailed below.

1

On April 19, 2006, Desrochers and Lowes, along with two other SBPD sergeants (Steve Filson and William Hanley), filed an informal grievance against their supervisor, Lieutenant Mitchal Kimball, who headed the Specialized Enforce-

ment Bureau ("SEB").[1] There is no transcript of the meeting at which they presented their concerns. According to Captain Frank Mankin, who adjudicated the grievance, the complainants alleged that "there was an ongoing and continuing issue relative to a difference of personalities between the four sergeants" and Lieutenant Kimball. Mankin continued: "It was the impression of the four sergeants that the interaction between themselves and Lieutenant Kimball had risen to a level so as to impact the operational efficiency and effectiveness of the units over which Lieutenant Kimball had managerial oversight." The sergeants requested that the department 1) remove Kimball from command of the SEB; 2) formally investigate the charges contained in their grievance; 3) place Kimball on a "[w]ork performance contract"; 4) order Kimball to attend "[i]nterpersonal relations training"; and 5) monitor Kimball's conduct in the future.

After learning of the informal grievance, Kimball immediately requested a transfer from the SEB. His transfer request was granted, and Desrochers and Lowes both admit that they had little to no contact with Kimball after the transfer. Lieutenant Brian Boom replaced Kimball.

Meanwhile, Filson and Hanley reached an agreement with the Chief of Police, Michael Billdt, which resolved their concerns. Desrochers and Lowes' grievance remained outstanding.

---

[1]The grievance was filed pursuant to the City of San Bernardino's Memorandum of Understanding for "Police Safety Employees." The grievance process is divided into informal and formal stages. The informal stage involves a face-to-face meeting between the employee and a supervisor. If the grievance cannot be resolved at that level, the formal stage begins. That stage, in turn, is broken down into several steps: 1) filing a written grievance with a supervisor; 2) meeting with a division head; 3) meeting with the police chief; 4) filing a written appeal with the director of human resources; and 5) filing a written appeal with the mayor.

2

Believing that the SBPD had not taken adequate steps to resolve their concerns, Desrochers and Lowes filed a formal grievance against Kimball as well as Billdt and Mankin. The sergeants alleged that Kimball had created a "hostile work environment by his repeated violations" of various internal SBPD policies. The grievance also accused Billdt and Mankin of perpetuating this environment by "fail[ing] to take appropriate action." Desrochers and Lowes each attached declarations detailing their concerns.

In his declaration, Lowes described the "[p]roblem" as follows:

> Lt. Kimball is a very autocratic, controlling and critical supervisor. Everyone that works for him has felt the stress that he brings to every situation[. . . .] He controls and manipulates every conversation until it concludes to his satisfaction. He absolutely discourages any dissention [sic] from his opinion and gives the definite sense that anyone that disagrees with his approach is incompetent. He often uses the phrase "hammer-nail" to illustrate that he is the hammer and everyone else is the nail . . . . we do and go where he tells us. These are general descriptions of Lt. Kimball that are well understood by everyone under his control. He operates in the belief that everyone around him is incompetent and that, without his influence, the police department would quickly fail.

In short, Lowes asserted that Kimball's "approach and tactics were destroying the moral [sic] and confidence of his men."

Lowes provided examples. On one occasion, Kimball "chewed out" Lowes in front of members of the Rialto Police Department, implying that the other department was "incom-

peten[t]." Lowes claimed that this incident "undermined [his] effort to build a positive relationship with Rialto PD and assist them . . . in a positive way." On another occasion, "Kimball embarrassed the [San Bernardino] SWAT team by confronting a visiting SWAT team (Riverside PD)," leaving the "definite impression" that he "thought that Riverside PD was incompetent."

Lowes also described Kimball as a "micro-manage[r]," someone who "insult[s]" fellow officers, one who "undermines . . . efforts to develop . . . team members," and a man whose "need to be technically correct and powerful at every turn ultimately destroys relationships." Lowes admitted that all the incidents he recounted "taken individually may seem minor." Combined, however, Lowes thought that

> [t]hese incidents amount to added stress and distrust in the daily operations of the unit. Individual team members feel that Lt. Kimball is making a power play for no other reason than to be powerful. The stress and conflict between [Lowes'] team building values/mission and Lt. Kimball's need for his definition of power or control make the [Gang Unit] sergeant position unrewarding.

Desrochers stated that while he had never before filed a complaint against any member of the police department, he did so here because he "believe[d] it to be a necessary step forward in an attempt to change the culture of this police department and the way we treat each other." Throughout the complaint, he repeatedly referenced Kimball's "management style." He detailed occasions where he felt Kimball "belittled [him] in front of [his] investigators and patrol officers," indicating that "[Kimball] did not trust [the] judgment" of Desrochers and his fellow officers. He also recounted a "tantrum" Kimball threw in front of members of a neighboring police force. Desrochers believed that Kimball's behavior "did not put the San Bernardino police department in a positive light,"

and demonstrated that "Kimball was not eager to work cooperatively with this other agency."

Desrochers also maintained that Kimball's "autocratic style" and "disregard for [his] rank or authority . . . did not inspire . . . confidence, and circumvented [Desrochers'] authority with [his] investigators." As evidence, Desrochers noted situations where Kimball's orders contradicted his own.

Ultimately, Desrochers concluded that Kimball's reputation as "an autocratic leader" and his "management style and bullying" affected the Homicide Unit "in a negative way."[2] Kimball, Desrochers stated, "made it very clear that he wanted things his way and only his way and he did not care about or trust the opinions of any investigator in [the Homicide] unit." Desrochers claimed that this not only "negatively effected [sic] moral [sic] in [the] unit," but also "made it very difficult for [him] to perform [his] duty" to the point at which he was "unable to supervise the unit because of [Kimball's] interference."

The grievance alleged that Billdt and Mankin did not take the appropriate steps to remedy the "hostile work environment" created by Kimball. Desrochers and Lowes charged Billdt and Mankin, like Kimball, with violations of internal SBPD policies. Desrochers believed that "Mankin was more concerned about Lieutenant Kimball's future promotion than he was about our issues." Desrochers further stated that the "inaction on the part of Chief Billdt and Captain Mankin has negatively effecting [sic] my unit," while Lowes accused Mankin of giving him an order in "a clear attempt to cause . . . stress."

---

[2]For example, Desrochers described an incident where he gave an investigator permission to perform a task, and the investigator "jokingly said, 'are you sure you don't want to check with the lieutenant first, since he makes all the decisions[?]' "

As a remedy, the grievance requested 1) "[a]cknowledgment that the . . . listed violations of policy and core values are not condoned by the administration of the San Bernardino Police Department"; 2) an agreement "to monitor and develop Lt. Kimball in order to prevent any future [simi-lar] incidents"; and 3) a commitment to "develop and publish additions to . . . organizational core values that . . . reflect the type of culture that fosters respect and friendly interaction between all employees regardless of rank."

In due course, Mankin notified Desrochers and Lowes that their formal grievance had been denied.

3

On June 19, 2006, Desrochers and Lowes filed a complaint with the City's Human Resources Department ("HR"), appending their formal grievance against Kimball, Mankin, and Billdt. The complaint was marked "CONFIDENTIAL." Additionally, they raised concerns regarding the performance of Boom, the officer who had replaced Kimball. Specifically, they feared that "Boom will be used as a tool by [Billdt] to retaliate against [the sergeants] for reporting the grievance." The complaint alleged that other officers were "very much . . . victim[s] of stress due to Lt. Boom's hostile work environ-ment practices." It also stated that Billdt had "mentioned to many within the department that he is very disappointed in [Desrochers and Lowes] for filing [their grievance]." Lowes reported that when he refused to sign a document resolving the matter at the informal stage, Billdt told him that he was "going to do something and that 'thing' would be for the good of the department." Lowes "took [that] as a threat of retalia-tion." Finally, Desrochers and Lowes noted that Mankin had been promoted to assistant chief while their grievance against him was pending. They saw this as evidence of a "double standard," because "[p]romotions in [the] department are often put on hold pending the outcome of investigations of

misconduct." Both officers claimed they filed the complaint "for the good of the department."

On June 23, 2006, Desrochers and Lowes amended their HR complaint, adding details of several incidents involving Boom. They accused Boom of having a "long history of inappropriate and harassing comments given to coworkers, peers and subordinates." For example, on one occasion, Boom had made an offensive comment about Desrochers' wife; on another occasion he had done the same with respect to Desrochers' daughter. Boom had also "poked fun" at an overweight officer. When Desrochers discussed the latter incident with Mankin, Mankin informed him that his concerns regarding Boom were "unfounded."

In addition to the remedies detailed in the formal grievance, Desrochers and Lowes requested: "removal of Lt. Boom as SEB supervisor and replacement by Lt. R.C. Garcia"; "full investigation of Chief Billdt's failure to investigate Lt. Boom"; and "full investigation of Lt. Boom for inappropriate and harassing comments." Ultimately, Desrochers and Lowes were denied the relief they requested from HR.

B

On December 20, 2006, the sergeants filed a complaint in the Central District of California under 42 U.S.C. § 1983, alleging that Desrochers' transfer and the disciplinary action against Lowes constituted retaliation for engaging in speech protected by the First Amendment. In addition to the constitutional claim, Desrochers and Lowes raised several state law claims. The district court concluded that the sergeants' speech did not address matters of public concern. The court therefore granted summary judgment to the defendants on the § 1983 claims and declined to exercise supplemental jurisdiction over the state law claims.

The sergeants timely appealed.

II

A First Amendment retaliation claim against a government employer involves

> a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009). Because the district court concluded that Desrochers and Lowes' speech did not touch on matters of public concern, its analysis ended at step one.

Our review is therefore limited to the public concern inquiry. We have "not articulated a precise definition of 'public concern,' " *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir. 1987), recognizing instead that such inquiry "is not an exact science," *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001). Accordingly, we have forsworn "rigid multi-part tests that would shoehorn communication into ill-fitting categories," *id.*, and relied on a generalized analysis of the nature of the speech. Perhaps unsurprisingly, "courts have had some difficulty deciding when speech deals with an issue of 'public concern.' " *McKinley v. City of Eloy*, 705 F.2d 1110, 1113 (9th Cir. 1983).

It is clear, however, that the essential question is whether the speech addressed matters of "public" as opposed to "personal" interest. *Connick v. Myers*, 461 U.S. 138, 147 (1983).

"[This] inquiry is purely a question of law, which we review de novo." *Eng*, 552 F.3d at 1070; *see also Connick*, 461 U.S. at 148 n.7.[3] The plaintiffs "bear[ ] the burden of showing that the[ir] speech addressed an issue of public concern," *Eng*, 552 F.3d at 1070, based on "the content, form, and context of a given statement, as revealed by the whole record," *Connick*, 461 U.S. at 147 48.

A

The sergeants urge us to conclude that their speech " 'can fairly be considered to relate to' " a matter of public concern. *Eng*, 552 F.3d at 1070 (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995)).[4] We have defined

---

[3]We review a district court's grant of summary judgment de novo. *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003); *see also id.* ("Viewing the evidence in the light most favorable to the plaintiffs, we must determine whether there are any genuine issues of material fact and whether the [district court] correctly applied the relevant substantive law.").

[4]At times, we have phrased the question differently, finding employee speech unprotected "unless it 'substantially involved matters of public concern.' " *Johnson*, 48 F.3d at 422 (quoting *McKinley*, 705 F.2d at 1114); *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (same); *Flores v. San Diego County*, 206 F.3d 845, 846 47 (9th Cir. 2000) (per curiam) (same); *Brewster v. Bd. of Educ.*, 149 F.3d 971, 978 (9th Cir. 1998); *Roe v. City & County of S.F.*, 109 F.3d 578, 584 (9th Cir. 1997) (same). We apply the fairly considered standard here, because that appears to be the language the Supreme Court employed in *Connick*. *See* 461 U.S. at 147 ("[I]f Myers' questionnaire cannot be *fairly characterized* as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge." (emphasis added)); *id.* ("When employee expression cannot be *fairly considered* as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices . . . ." (emphasis added)). Moreover, the Court has recently reiterated this standard. *See Engquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146, 2151 (2008) (quoting the "fairly considered" passage from *Connick*); *see also Care-Partners, LLC v. Lashway*, 545 F.3d 867, 880 (9th Cir. 2008) (employing the "fairly considered" language); *Voight v. Savell*, 70 F.3d 1552, 1559 (9th Cir. 1995) (same); *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (same). If the distinction between "fairly considered" and "substantially involved" is more than just semantics, we are satisfied that our decision is correct under either standard.

the "scope of the public concern element . . . broadly," *Ulrich v. City & County of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002), and adopted a "liberal construction of what an issue 'of public concern' is under the First Amendment," *Roe v. City & County of S.F.*, 109 F.3d 578, 586 (9th Cir. 1997). But there are limits. "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Johnson*, 48 F.3d at 425; *see also Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (quoting the "close case" language of *Johnson*, but deciding that "[t]his is . . . not a close case"); *Roe*, 109 F.3d at 586 (applying the "close case" language of *Johnson*). We assess each aspect of the *Connick* test in turn.

1

"First and foremost, we consider the content of the speech," *Weeks*, 246 F.3d at 1234, " 'the greatest single factor in the *Connick* inquiry.' " *Johnson*, 48 F.3d at 424 (quoting *Havekost v. U.S. Dep't of the Navy*, 925 F.2d 316, 318 (9th Cir. 1991)). Desrochers and Lowes claim that the content of their speech pertains to the morale of their units, the "operational efficiency and effectiveness" of the SBPD, and potential misconduct by government officials—matters which they contend are inherently of public concern.

[1] To address a matter of public concern, the content of the sergeants' speech must involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley*, 705 F.2d at 1114 (internal quotation marks and citation omitted); *see also Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (describing "matter[s] of political, social, or other concern to the community" as matters of public concern). "On the other hand, speech that deals

with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.' " *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley*, 705 F.2d at 1114); *see also Connick*, 461 U.S. at 154 (stating that speech limited to "an employee grievance concerning internal office policy" is unprotected). The same is true of "speech that relates to internal power struggles within the workplace,"[5] and speech which is of no interest "beyond the employee's bureaucratic niche." *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (internal quotation marks and citation omitted).

[2] Desrochers and Lowes attempt to characterize their grievances as necessarily implicating issues such as the "competency," "preparedness," "efficiency," and "morale" of the SBPD. *See McKinley*, 705 F.2d at 1114 (stating that "the competency of [a] police force is surely a matter of great public concern"); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999) ("[A]n opinion about the preparedness of a vital public-safety institution . . . goes to the core of what constitutes speech on matters of public concern."); *Allen*, 812 F.2d at 431 (noting that speech "related to the competency of . . . management as well as the efficient performance of [government] duties" addressed a matter of public concern); *McKinley*, 705 F.2d at 1114 (noting that "discipline and morale in the workplace . . . are related to an agency's efficient performance of its duties," and hence may inform the public concern inquiry (internal quotation marks and citation omitted)). We are not persuaded. We have never held that a simple reference to government functioning automatically qualifies as speech on a matter of public concern. To the contrary, as we have recently indicated, the fact that speech contains "passing references to public safety[,] incidental to the message conveyed" weighs against a finding of

---

[5]This consideration has a contextual element to it. *See infra* p. 8697.

public concern. *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009) (internal quotation marks and citation omitted).

**[3]** To be sure, as the cases cited above indicate, at times we have employed broad language.[6] But those sweeping pronouncements cannot be read to encompass the content of the speech before us. *See, e.g.*, *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1405 (9th Cir. 1988) ("We do not necessarily suggest that all speech concerning . . . government inefficiency automatically deserves protection."). For example, what if we judges prohibited our law clerks from taking coffee breaks? Suppose they responded with a memorandum complaining about the action. While they might assert—perhaps fairly— that caffeine deprivation would adversely affect their performance, morale, efficiency, and thus, their competency, no one would seriously contend that such speech addressed a matter of public concern. *See Havekost*, 925 F.2d at 319 (stating that the speech regarding the "length and distribution of coffee breaks" does not address a matter of public concern). Similarly, the reality that poor interpersonal relationships amongst coworkers might hamper the work of a government office does not automatically transform speech on such issues into speech on a matter of public concern.[7]

---

[6]*Eng* employed similar language. 552 F.3d at 1073 ("Speech that is relevant to the public's evaluation of the performance of governmental agencies also addresses matters of public concern." (internal alternations, quotation marks, and citations omitted)); *id.* at 1072 ("Communications on matters relating to the functioning of government are matters of inherent public concern." (internal alternations, quotation marks, and citations omitted)).

[7]Contrary to the dissent's assertions, this is not a "disparaging" comparison. *See* Dissent at 8715. We provide it only to show that not all comments on perceived deficiencies in the functioning of a government office amount to speech on a matter of public concern. There is a significant distinction between complaints of a poor working relationship with one's superior and complaints involving on-the-job consumption of alcohol, anti-Semitism, use of excessive force, discrimination, and allegations of racial and gender bias. *See Robinson*, 566 F.3d at 821; *Cochran v. City of L.A.*, 222 F.3d 1195, 1201 (9th Cir. 2000). *Contra* Dissent at 8709-10 (citing *Robinson* and *Cochran* as "analogous" to the facts of this case).

Moreover, the plain language of the grievances differs from the sergeants' post hoc characterizations. We look to what the employees actually said, not what they say they said after the fact. In *Roe*, for example, a police officer transmitted a memorandum to a district attorney's office, detailing his view on a discrete legal issue. *See* 109 F.3d at 580-81. The memorandum contained "legal questions and case summaries which appeared to be from prepared materials." *Id.* at 581. On appeal, Roe argued that his memorandum "addressed search and seizure issues of vital interest to citizens in evaluating their government in that a suspected felon would escape prosecution because [the district attorney] had misunderstood the relevant Fourth Amendment law." *Id.* at 585 (internal quotation marks omitted). We disagreed, stating that "[i]f Roe's letter had stated just that, his argument would be stronger. However, such a reading is not to be found in his missive." *Id.* "No message of vital public import" was to be found in an "inter-office transmittal of case citations and summaries." *Id.*

**[4]** As in *Roe*, we decline to "construe [the sergeants' speech] differently from its plain language." *Id.* Here, the plain language of the grievances does not "directly address[ ] police competence," Dissent at 8712, but rather indicates that Desrochers and Lowes were involved in a personality dispute centered on Kimball's management style. The speech in question is largely devoid of reference to matters we have deemed to be of public concern. There are no allegations of conduct amounting to "actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148.[8] One can read the grievances and conclude that Kimball was arrogant, Boom was irreverent, and Mankin and Billdt disagreed with the ser-

---

[8]Desrochers and Lowes' briefs are laced with references to the "misconduct" of their supervisors. To paraphrase a memorable line, while they keep using that word, we do not think it means what they think it means. Merely cataloguing a strained working relationship with a superior does not necessarily allege "actual or potential wrongdoing or breach of public trust." *Connick*, 461 U.S. at 148.

geants' assessment of their lieutenants, but that does not mean they were incompetent, and it certainly does not mean that they were malfeasant. *Cf. McKinley*, 705 F.2d at 1114.

**[5]** Likewise, while the grievances state that Kimball's actions "made it difficult for [the sergeants'] teams to function" and impacted the SBPD "in a negative way," a reader struggles in vain to discover where or how the proper functioning of the police department was jeopardized by the actions of Kimball, Mankin, Billdt, or Boom. *Cf., e.g.*, *Gilbrook*, 177 F.3d at 866 (involving statements which addressed "the fire department's ability to respond effectively to life-threatening emergencies"). There are no accounts of failed law enforcement efforts, no descriptions of botched investigations, and no discussion of duties the SBPD was unable to perform in a competent fashion due to the actions of the sergeants' supervisors.[9] *Cf., e.g.*, *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992) (involving speech on the "inept, inefficient, and potentially harmful administration of a governmental entity"). Desrochers and Lowes do not allege that anyone failed to do his job, or even that someone did his job poorly. *Cf., e.g.*, *Gillette*, 886 F.2d at 1197-98 (involving speech criticizing police officers for using excessive force on a particular occasion).[10] Rather, the sergeants complain about their superiors'—especially Kimball's—personalities; the grievances amount to a laundry list of reasons why Desrochers, Lowes, and perhaps other SBPD employees found working for Kimball to be an unpleasant experience.[11] In short, they thought their boss was a bully and said so.

---

[9]Nor are there descriptions of any instances when the SBPD's ability to work with nearby police forces was impaired. Indeed, the record contains declarations from neighboring police chiefs describing a positive relationship with the SBPD, including with Kimball.

[10]The dissent repeatedly suggests that the competency of the SBPD is somehow at issue in the sergeants' grievances. Yet, in light of such glaring omissions, how can that be the case? *See infra* note 12 (discussing the "competency" issue further).

[11]We have said that "the way in which an elected official or his appointed surrogates deal with diverse and sometimes opposing view-

**[6]** But when working for the government, saying one's boss is a bully does not necessarily a constitutional case make. "[T]he *content* of the communication must be of broader societal concern. [Our] focus must be upon whether the public or community is likely to be *truly interested* in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Roe*, 109 F.3d at 585 (emphases added). On the facts of this case, we cannot say that the public would be truly interested that two police sergeants believed their supervisor was a "micro-manager," "autocratic" and "controlling," or even that he dressed them down in front of their colleagues and neighboring police forces.[12]

points from within government is an important attribute of public service about which the members of society are entitled to know." *McKinley*, 705 F.2d at 1115. It is certainly true that the grievances contain several descriptions of the manner in which Kimball dealt—or failed to deal—with "diverse and sometimes opposing viewpoints." Kimball, however, was a police lieutenant, not an "elected official or his appointed surrogate[ ]."

[12]Our recent decision in *Robinson* supports our conclusion. In that case, a police officer reported, inter alia, a supervisor's "harassment and verbal abuse" "in front of numerous [colleagues]." *Robinson v. County of L.A.*, No. CV-06-2409-GAF, slip op. at 3 (C.D. Cal. Aug. 7, 2007). The district court held that the officer's "displeasure at his treatment by a superior officer constitutes 'an individual personnel dispute and grievance,' " not speech on a matter of public concern. *Id.* at 5 (quoting *Coszalter*, 320 F.3d at 973). Other elements of the officer's speech, however, warranted constitutional protection. *Id.* We affirmed the district court, specifically referencing its findings on the harassment and verbal abuse issue. *See Robinson*, 566 F.3d at 822 ("With the exception of the three incidents identified by the district court as individual personnel disputes, each of these is clearly a 'matter of public concern.' ").

The dissent attempts to skirt this holding, claiming that "[u]nlike Desrochers and Lowes, however, Robinson did not demonstrate that [these incidents were] part of a broader pattern of abuse that impacted the operational efficiency of the department." Dissent at 8709 n.1. But just how could Desrochers and Lowes have "demonstrated" a "pattern of abuse" much less one that "impacted the operational efficiency" of the department? *See supra* pp. 8689-92. The only suggestion that the "opera-

Such speech, "if released to the public, would convey no information at all other than the fact that [two] employee[s were] upset with the status quo," *Connick*, 461 U.S. at 148, and is of no relevance "beyond the employee[s'] bureaucratic niche," *Tucker*, 97 F.3d at 1210. On numerous occasions, our sister circuits have suggested that complaints of this nature would not trigger constitutional protection. *See Taylor v. Carmouche*, 214 F.3d 788, 789 92 (7th Cir. 2000) (explaining that speech "concern[ing] supervisory management styles" would be unprotected); *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 374 (5th Cir. 2000) (noting that "criticiz[ing] the management style or job performance of [a] direct superior" would cut against a public concern finding), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Gardetto v. Mason*, 100 F.3d 803, 814 (10th Cir. 1996) ("Management practices or decisions allocating management responsibility to particular individuals also do not involve matters of public concern."); *see also Brooks v. Univ. of Wis. Bd. of Regents*, 406 F.3d 476, 480 (7th Cir. 2005) (describing "infighting" and decisions which "undermine" an individual's "control of a department" as "a classic personnel struggle").[13] Indeed, to hold otherwise here would

---

tional efficiency" of the department was "impacted" is found in one sentence of Mankin's characterization of their remarks. As noted above, however, we have held that "passing references to public safety[,] incidental to the message conveyed," do not implicate matters of public concern. *Robinson*, 566 F.3d at 823 (internal quotation marks and citation omitted). Again, not all speech concerning government functioning automatically deserves protection. *See Roth*, 856 F.2d at 1405; *see supra* pp. 8689-92. For the reasons discussed throughout this opinion, Mankin's description of the sergeants' speech, analyzed with an eye to its "content, form, and context . . ., as revealed by the whole record," *Connick*, 461 U.S. at 147 48, fails to obtain First Amendment protection.

[13]On one occasion, we did find speech involving a supervisor's management style to be of public concern. *See Lambert v. Richard*, 59 F.3d 134 (9th Cir. 1995). That case, however, is distinguishable on grounds of form and context. *See infra* pp. 8699-8700.

be to create the potential for litigation in every workplace gripe exchanged around the water cooler.[14]

**[7]** Boiled down to its essence, the speech at issue reflects dissatisfaction with a superior's management style and the ongoing personality dispute which resulted.[15] Recognizing that the content of the speech relates at best only tangentially to matters of public concern, we proceed to the next prongs of the *Connick* test.

2

**[8]** The sergeants do not claim that the form of their speech lends itself to a finding of public concern. Nor could they. The fact that the speech took the form of an internal employee grievance means that the public was never made aware of Desrochers and Lowes' concerns. "That [the employee] expressed his views inside his office, rather than publicly, is not dispositive." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006). We have recognized, however, that "[a] limited audience weigh[s] against [a] claim of protected speech." *See Roe*, 109 F.3d at 585; *McKinley*, 705 F.2d at 1114 ("The result in

---

[14]The dissent claims that these out-of-circuit cases stand only for the proposition "that speech is not of public concern when the employee complains of management issues that do not implicate the effective operation and provision of public service." Dissent at 8711. Rather, these cases suggest that speech regarding a supervisor's management style, in and of itself, does not necessarily "implicate the effective operation and provision of public services." Moreover, the scenarios they address appear to fall well within the dissent's expansive concept of public concern. If a poor working relationship between employees and their supervisor "implicate[s] the effective operation and provision of public services" why would complaints about overbearing managers or disputes over employee autonomy and professionalism not do likewise?

[15]Nothing we say here should be taken to suggest that "the competency of [a] police force" is anything but a matter of "great public concern." *McKinley*, 705 F.2d at 1114. We conclude only that the speech at issue here does not implicate the competency of a police force in any meaningful way.

*Connick* is also explained by the fact that the employee did not seek to inform the public about the operation of a public agency." (internal quotation marks and citation omitted)).

The relevance of non-disclosure to the public tracks the Supreme Court's acknowledgment that "the public's interest in receiving the well-informed views of government employees engaging in civic discussion" is one of the primary purposes of its First Amendment retaliation jurisprudence. *Garcetti*, 547 U.S. at 419. "Public speech is more likely to serve the public values of the First Amendment. Private speech motivated by an office grievance is less likely to convey the information that is a prerequisite for an informed electorate." *Weeks*, 246 F.3d at 1235 (citation omitted). Thus, though "a private complaint may relate to a matter of public concern," our consideration of the form Desrochers and Lowes adopted to convey their message "help[s us] identify [whether their] speech . . . is of public concern." *Id.*[16]

**[9]** Because the speech at issue took the form of internal employee grievances which were not disseminated to the public, this portion of the *Connick* test cuts against a finding of public concern.[17]

### 3

Finally, Desrochers and Lowes argue that the context in which their speech was uttered suggests that they were motivated, not by a personal vendetta against Kimball, but rather out of a concern for the well-being of the SBPD.

---

[16]This is "particularly [true] in close cases." *Weeks*, 246 F.3d at 1235.

[17]We do not suggest that broadcasting an employee grievance to the public automatically transforms such speech into speech on a matter of public concern. The form of the speech is only one factor in the *Connick* balancing test. That said, it is still a factor. The dissent minimizes such element, *see* Dissent at 8716-17, a consideration the Supreme Court directed us to analyze in *Connick*.

**[10]** The sergeants are correct that "[t]o aid us in ascertaining when speech . . . rises to a level of public concern, we examine the context of the speech, particularly the *point* of the speech." *Roth*, 856 F.2d at 1405; *see also Gillbrook*, 177 F.3d at 866 ("An employee's motivation [is] relevant to the public-concern inquiry."). In other words, why did the employee speak (as best as we can tell)? Does the speech "seek to bring to light actual or potential wrongdoing or breach of public trust," or is it animated instead by "dissatisfaction" with one's employment situation? *Connick*, 461 U.S. at 148; *Roth*, 856 F.2d at 1405. The question of whether the speech was made to "further some purely private interest" is relevant to that inquiry, *Havekost*, 925 F.2d at 318, as is a determination of whether the speech was made in the context of a workplace "power struggle," *Tucker*, 97 F.3d at 1210 (internal quotation marks and citation omitted).

**[11]** The sergeants' claims of altruistic motivation find some support in the record. The grievances state that Desrochers and Lowes felt compelled to act "for the good of the department." They believed that their actions were "a necessary step forward in an attempt to change the culture of this police department and the way we treat each other." This characterization of the sergeants' motivation is further bolstered by the fact that when Desrochers and Lowes initiated their complaints, they held "secure" positions. *Roth*, 856 F.2d at 1406. Thus, their speech was not "precipitated by adverse actions of [their] supervisors pertaining to [their] employment," such as a transfer or demotion. *Id.* Similarly, the record indicates that at least one of the sergeants had never before filed any form of grievance.

**[12]** However, the record also contains undisputed evidence that Desrochers and Lowes were motivated by their dissatisfaction with their employment situation brought on by "a difference of personalities between" the sergeants and Kimball. For example, Lowes forthrightly described his job as "unrewarding" so long as Kimball was his supervisor. The ser-

geants even asked that Kimball be required to attend "[i]nterpersonal relations training," and that the SBPD formally acknowledge that their vision of how an office should be run was right, and Kimball's was wrong.

*Connick*—which itself turned on a contextual inquiry—is especially instructive here. In that case, an assistant district attorney, Sheila Myers, was informed that she would be transferred. 461 U.S. at 140. She was "strongly opposed to the proposed transfer," and made her objections known to several supervisors. *Id.* Despite her concerns, she was told that the decision was final. In response, Myers circulated a questionnaire to the office "concerning office transfer policy, office morale, [and] the level of confidence in supervisors." *Id.* at 141.[18] The Court concluded, however, that these matters were not of public concern. Instead, they were "*mere extensions* of Myers' dispute over her transfer." *Id.* at 148 (emphasis added).

[13] Here, Desrochers and Lowes' speech was "mere[ly an] extension[ ]" of the running spat between the sergeants and Kimball. *See Voight v. Savell*, 70 F.3d 1552, 1560 (9th Cir. 1995) (describing speech as an "extension of [a] personal dispute" between coworkers).[19] The ultimate source of the grievances can be traced to the simple fact that the sergeants and Kimball did not get along. They preferred a particular management style, and he employed another. Their initial informal grievance centered on Kimball and Kimball alone. It was not until Mankin and Billdt disagreed with Desrochers and Lowes' assessment of Kimball's performance that they, too,

---

[18]Myers' questionnaire also asked "whether employees felt pressured to work in political campaigns." *Connick*, 461 U.S. at 141. This was the sole matter the Court found to be of public concern. There is no similar speech in the grievances at issue here.

[19]The *Voight* panel ultimately held aspects of the speech in that case to be on matters of public concern. *See* 70 F.3d at 1560. That speech involved discrimination and unfairness in hiring practices, matters not at issue in this case. *See id.*

became objects of the sergeants' ire. Accordingly, "we do not believe these [statements] are of public import in evaluating the performance of" the SPBD. *Connick*, 461 U.S. at 148.[20]

Our opinion in *Lambert v. Richard*, 59 F.3d 134 (9th Cir. 1995), is not to the contrary. There, the plaintiff, Lambert, read a prepared statement criticizing her supervisor, the director of the local library, at a city council meeting. *Id.* at 135. The supervisor was described as an individual who "mismanaged the library department and treated employees in an abusive and intimidating manner." *Id.* at 136. His conduct was allegedly "having an adverse effect on service to the public." *Id.* "Lambert told the council that the library was 'barely' functioning and that employees who dealt regularly with the public were performing 'devoid of zest, with leaden hearts and wooden hands.' " *Id.* We concluded that Lambert's speech was on a matter of public concern. *Id.*

Portions of Desrochers and Lowes' grievances contain similar allegations about their supervisors' negative impact on unit morale.[21] Crucially, however, the context in *Lambert* was very different from the case at hand.[22] In *Lambert*, "the ten-

---

[20]Desrochers and Lowes claim that the fact that they continued to pursue their grievance even after Kimball voluntarily transferred to another unit demonstrates that they had the interests of the department at heart. Of course, this persistence could also be read to suggest that the sergeants were motivated by personal animosity towards Kimball. At this stage of the proceedings, we must construe the evidence in the light most favorable to the sergeants. However, that interpretation, standing alone, does not alter our ultimate conclusion. At best, it makes one portion, of one element, of a three-pronged inquiry cut slightly in the sergeants' favor.

[21]The dissent seems to believe this concession is fatal. *See* Dissent at 8712. We do not, however, make determinations of public concern based solely on the content of the speech in question. *See Connick*, 461 U.S. at 147 48 (requiring us to look to "the content, form, and context" of the speech "as revealed by the whole record").

[22]There is a difference in form as well as a difference in context. In *Lambert*, the plaintiff voiced her concerns in a public forum, at a city council meeting. *See* 59 F.3d at 135. In this case, the speech took the form of an internal grievance. *See supra* pp. 8695-96.

sion between the staff of the City Library and the defendant Richard [was a] subject of public discussion." *Id.* "Lambert was not the first city employee to publically question Richard's job performance. Librarians had been wearing anti-Richard buttons to work. Two weeks before Lambert addressed the council [the union president] had complained to that body about . . . the staff's lack of confidence in Richard." *Id.* at 135. No such political struggle occurred here. Desrochers and Lowes never claim to have disclosed their concerns publically, and there is no indication that the general public was even remotely aware of Kimball's actions. There is a marked distinction between speech motivated by personal differences and circulated to a few colleagues, and speech before a city council on a matter in the public eye. The Supreme Court has warned us that speech "not otherwise of public concern does not attain that status because its subject matter could, *in different circumstances*, have been the topic of a communication to the public that might be of general interest." *Connick*, 461 U.S. at 148 n.8 (emphasis added). The question is not whether particular subjects "could be matters of public concern"; the question is whether "*this* [speech]" meets the test. *Id.*[23]

**[14]** Therefore, we conclude that "*this* [speech]," taken in context, merely reflects two employees' dissatisfaction with their employment situation, a conclusion which weighs against a finding of public concern. 461 U.S. at 148.

---

[23]The dissent does not believe *Lambert* is distinguishable. *See* Dissent at 8710-11 & n.2. But it misapprehends the tripartite nature of our inquiry to find *Lambert* controlling because that case likewise involved speech centered on a supervisor's management style. We look not only to content, but also to form and context. *Lambert* did not hold that discussions of a supervisor's management style were categorically matters of public concern. Rather, it held that discussions of a supervisor's management style were matters of public concern when those discussions were held in public and the general populace was already interested in the subject.

B

After assessing "the content, form, and context" of the sergeants' grievances, "as revealed by the whole record," *Connick*, 461 U.S. at 147 48, we conclude that Desrochers and Lowes failed to meet their burden to demonstrate that their speech "can be fairly considered as relating to a matter of political, social, or other concern to the community," *Voight*, 70 F.3d at 1559. While the working environment in the SEB might have been unpleasant, the speech at issue involved nothing more than an internal dispute. "An internal dispute with no wider societal implications is not a matter of public concern. Instead, it falls within the genre of 'personnel disputes and grievances' which are not constitutionally significant." *Roe*, 109 F.3d at 586.[24]

The dissent obviously reaches a different conclusion. However, every case cited by the dissent to reach such conclusion contains significant factual distinctions from the matter at hand.[25] Given the fact-intensive nature of our inquiry, these

---

[24]We agree with the Supreme Court that "public employers should, as a matter of good judgment, be receptive to constructive criticism offered by their employees." *Garcetti*, 547 U.S. at 425 (internal quotation marks and citation omitted). In this case, it appears that Kimball was receptive of Desrochers and Lowes' concerns—when he discovered that they had difficulties working with him, he immediately requested and received a transfer. We reject, however, the notion that such criticism—constructive or otherwise—is automatically a matter of public concern for purposes of First Amendment retaliation claims.

[25]*See Robinson*, 566 F.3d at 821 (on-the-job consumption of alcohol, anti-Semitism, use of excessive force, and discrimination); *Cochran*, 222 F.3d at 1201 (racial and gender bias); *Voight*, 70 F.3d at 1560 (discrimination and unfairness in hiring practices); *Lambert*, 59 F.3d at 135 (statements made before a city council on a matter already in the public eye); *Johnson*, 48 F.3d at 421 (misuse of public funds); *Gillette*, 886 F.2d at 1197-98 (use of excessive force); *Roth*, 856 F.2d at 1403 ("wastefulness, mismanagement, unethical conduct, violations of regulations, and incompetence"); *McKinley*, 705 F.2d at 1112 (speech on police compensation made in a public forum).

distinctions make all the difference. The speech at issue in this case is simply not of the same ilk. If the mere suggestion that a bullying superior affects the morale and operational effectiveness of a public agency were enough to create speech on a matter of public concern, *Connick* would cease to mean much.

**[15]** That said, the fact that this case has generated a thoughtful dissent suggests that it is close. But once again, we have said that "[i]n a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not . . . involve a matter of public concern." *Johnson*, 48 F.3d at 425; *see also Weeks*, 246 F.3d at 1235. The subject matter of the speech before us at best relates "only marginally" to issues of public concern, the grievances were motivated by a personal dispute, and the sergeants' concerns were never relayed to the press or the public. Accordingly, Desrochers and Lowes' speech is "most accurately characterized as an employee grievance concerning internal office policy." *Connick*, 461 U.S. at 154.[26]

We reach our conclusion in light of the Supreme Court's repeated admonition that "while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Garcetti*, 547 U.S. at 420 (internal quotation marks and citation omit-

---

[26]Because the sergeants' speech was not on a matter of public concern, we likewise conclude that any "follow-up communications" which could be read to imply that the SBPD was "sweeping misconduct under the rug" are not speech on a matter of public concern. *See Robinson*, 566 F.3d at 823. As we noted, in this case, there is no "misconduct" to be swept under the rug. *See supra* note 8. It would be incongruous to hold speech containing allegations of a cover-up to be speech on a matter of public concern when the matter allegedly being "covered up" is not itself of public concern.

ted); *see also Connick*, 461 U.S. at 154.[27] "[A] federal court is not the appropriate forum in which to review the wisdom of a personnel decision . . . ." *Connick*, 461 U.S. at 147. To transform every workplace squabble into the proverbial "federal case" would be to trivialize the "great principles of free expression" the First Amendment embodies. *Id.* at 154.

As the district court concluded, a "ruling that [the sergeants'] speech addressed a matter of public concern, taken to its logical extreme, would allow a constitutional claim for nearly any internal administrative discussions by employees of a public agency." It "would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149. The First Amendment does not require such a result. As the Court said in *Connick*, it would indeed be a "Pyrrhic victory" if "a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here." *Id.* at 154.

## III

**[16]** For the foregoing reasons, Desrochers and Lowes cannot meet the threshold requirement to state a First Amendment retaliation claim under § 1983.[28] Accordingly, the district court's grant of summary judgment is

AFFIRMED.

---

[27]We cannot help but note that Desrochers and Lowes are quite literally attempting to "constitutionalize" an internal employee grievance. That recognition alone does not dispose of this case. But in light of the Supreme Court's warnings, it does make us chary of a finding of public concern.

[28]It follows that the officers are, in any event, entitled to qualified immunity.

WARDLAW, Circuit Judge, dissenting:

I respectfully dissent. The majority fails to view "the evidence in the light most favorable to the plaintiffs," *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003), as we must on summary judgment. It also fails to evaluate the " 'content, form, and context of a given statement, as revealed by the whole record,' " *Ulrich v. City & County of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)), and instead relies on only those portions of the record and case law that support its conclusion that the speech at issue was a mere "workplace gripe." Maj. Op. 8695. Because plaintiffs' speech " 'can fairly be considered to relate to' " a matter of public concern, *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995)), I would remand to the district court for consideration of the remaining elements of the First Amendment retaliation inquiry.

## I.

From the outset of the grievance process, Sergeants Michael Desrochers and Steve Lowes have maintained that supervising Lieutenant Mitchal Kimball's behavior impeded the proper functioning of the San Bernardino Police Department ("SBPD"). Captain Frank Mankin, a defendant in this case and the official to whom Sergeants Desrochers and Lowes first reported their informal grievance, documented the sergeants' claim "that the interaction between themselves and Lieutenant Kimball had risen to a level so as to impact the operational efficiency and effectiveness of the units over which Lieutenant Kimball had managerial oversight." In the informal grievance, the sergeants asserted that Kimball violated SBPD "policy and procedure[ ]" and acted inappropriately toward neighboring police departments. They requested that the city remove Kimball from command of the Specialized Enforcement Bureau ("SEB"), formally investigate the

charges contained in their grievance, order Kimball into additional training, and monitor Kimball's conduct in the future. Kimball immediately requested a transfer out of the SEB, which was granted, but the department failed to initiate an investigation of his conduct or order Kimball into additional training. In an attempt to terminate the grievance, Chief Michael Billdt prepared a resolution letter "acknowledg[ing] that a strained relationship existed between" the sergeants and Kimball, but Desrochers and Lowes refused to sign the letter because it did not address the institutional remedies that they had requested.

Desrochers and Lowes next filed a formal grievance against Kimball, charging that he created a "hostile work environment by his repeated violations" of internal policies and procedures, and added claims against Chief Billdt and Captain Mankin for "fail[ing] to take appropriate action" despite being "continually made aware of the hostile work environment." The sergeants addressed in further detail the impact of Kimball's behavior on the SBPD and on SBPD's interaction with other agencies. For example, Lowes reported that Kimball lectured him in front of the Rialto Police Department regarding the "incompetence of outside agencies" and criticized Lowes for being too "trusting" of the Rialto department. Lowes reported that this interaction "undermined [his] effort to build a positive relationship with Rialto PD and assist them . . . in a positive way." Further, "Kimball embarrassed the [San Bernardino] SWAT team by confronting a visiting SWAT team (Riverside PD)" when the Riverside team was training in San Bernardino. Lowes reported that Kimball left the "definite impression" that he "thought that Riverside PD was incompetent" during the confrontation. In total, Lowes reported that Kimball's "approach and tactics were destroying the moral[e] and confidence" of the department and that the independently minor "incidents amount to added stress and distrust in the daily operations of the unit."

Similarly, Desrochers complained that Kimball's "autocratic" "management style" "negatively" affected the morale in

his unit. He claimed that he was "unable to supervise the unit because of [Kimball's] interference," and, as a result, it was "very difficult for [him] to perform [his] duty." Desrochers also complained about Kimball's negative interaction with the members of the Beaumont Police Department in a meeting about warrant service, during which Kimball "did not put the San Bernardino police department in a positive light" and demonstrated that he "was not eager to work cooperatively with this other agency." Desrochers presented his grievance as "a necessary step forward in an attempt to change the culture of this police department and the way we treat each other."

In their formal grievance, the sergeants requested an "[a]cknowledgment that the . . . listed violations of policy and core values are not condoned by the administration of the San Bernardino Police Department" and that "the creation and maintenance of high moral[e] of department members is paramount for effective organizational health and development." They also sought an agreement "to monitor and develop Lt[.] Kimball in order to prevent any future incidents" and a commitment to "develop and publish additions to . . . organizational core values that . . . reflect the type of culture that fosters respect and friendly interaction between all employees regardless of rank." No satisfactory resolution was reached after this stage.

The sergeants next filed a complaint with the city's Human Resources Department against Kimball, Chief Billdt, and Captain Mankin. In addition to the conduct reported earlier, they complained of a threat of retaliation from Chief Billdt and included a claim against Lieutenant Boom, the officer who replaced Kimball as Desrochers's and Lowes's supervisor, for "inappropriate and harassing comments given to coworkers, peers and subordinates." They requested an investigation of Lieutenant Boom and Chief Billdt and replacement of Boom with a different lieutenant.

## II.

The first step of a First Amendment retaliation analysis is determining "whether the plaintiff spoke on a matter of public concern." *Eng*, 552 F.3d at 1070. "Although the boundaries of the public concern test are not well defined," *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam), it is clear that the matter should be "of political, social, or other concern to the community," *Voigt v. Savell*, 70 F.3d 1552, 1559 (9th Cir. 1995). In evaluating the " 'content, form, and context of a given statement,' " *Ulrich*, 308 F.3d at 978 (quoting *Connick*, 461 U.S. at 147-48), we may consider the "motivation and the chosen audience" for the speech, *Johnson*, 48 F.3d at 425, but " 'motive should not be used as a litmus test for public concern,' " *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925 (9th Cir. 2004) (quoting *Havekost v. U.S. Dep't of Navy*, 925 F.2d 316, 318 (9th Cir. 1991)). Moreover, we have adopted a "liberal construction of what an issue 'of public concern' is under the First Amendment," *Roe v. City & County of S.F.*, 109 F.3d 578, 586 (9th Cir. 1997), in recognition that " 'one of the fundamental purposes of the [F]irst [A]mendment is to permit the public to decide for itself which issues and viewpoints merit its concern,' " *Ulrich*, 308 F.3d at 978 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

Key to this inquiry is our recent holding that "[a]s a matter of law, 'the competency of the police force is surely a matter of great public concern.' " *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009) (quoting *McKinley*, 705 F.2d at 1114). In more general terms, we have described speech on matters of public concern as " '[s]peech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.' " *Coszalter*, 320 F.3d at 973 (quoting *McKinley*, 705 F.2d at 1114). Although the speech may involve broader issues such as " 'actual or potential wrongdoing or breach of public trust,' " *Roth v. Veteran's*

*Admin.*, 856 F.2d 1401, 1405 (9th Cir. 1988) (quoting *Connick*, 461 U.S. at 148), "it is sufficient that the speech concern matters in which even a relatively small segment of the general public might be interested," *Roe*, 109 F.3d at 585. Most importantly, the mismanagement of personnel, performance, functioning, and "inefficiency in managing and operating government entities are matters of inherent public concern," *Johnson*, 48 F.3d at 425; *see also Eng*, 552 F.3d at 1072; *Roth*, 856 F.2d at 1406; *McKinley*, 705 F.2d at 1114, as are " 'discipline and morale in the workplace,' " because those " 'are related to an agency's efficient performance of its duties,' " *McKinley*, 705 F.2d at 1114 (quoting *Connick*, 461 U.S. at 148). Moreover, the relevance of such concerns to the public increases when the operation of a public safety agency is at issue. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999) ("[A]n opinion about the preparedness of a vital public-safety institution . . . goes to the core of what constitutes speech on matters of public concern."); *see also Robinson*, 566 F.3d at 822; *McKinley*, 705 F.2d at 1114. Indeed, we have found speech to be of public concern even when it concerned exclusively "the manner in which police . . . performed their duties on a particular occasion." *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989).

In contrast, the "[o]nly speech" that is not of public concern is speech "that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies,' " *Robinson*, 566 F.3d at 822 (quoting *McKinley*, 705 F.2d at 1114); *Coszalter*, 320 F.3d at 973, including "speech that relates to internal power struggles within the workplace" or speech that is of no interest "beyond the employee's bureaucratic niche," *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (internal quotation marks omitted).

### III.

While the majority cites many of these legal principles, it fails to place them in the proper context. A canvass of our

prior case law reveals that the sergeants' speech is analogous to other instances of speech that we have found to relate to a matter of public concern.

In *Robinson*, for example, a police officer reported various incidents of officer misconduct in his department, such as retention of outside employment, consumption of alcohol during work hours, potentially anti-Semitic tattoos, alleged instances of battery and excessive force, and a potentially discriminatory sign. *See* 566 F.3d at 820-21. The officer also testified in a class action discrimination suit. *Id.* at 820. We affirmed the district court's conclusion that these statements, which involved "numerous instances of possible corruption, discrimination, or misconduct," were matters of public concern.[1] *Id.* at 822. We held that "[r]eports pertaining to others, even if they concern personnel matters including discriminatory conduct, can still be 'protected under the public concern test.'" *Id.* at 823 (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)). *Robinson* thus demonstrates that internal grievances regarding officer misconduct constitute a matter of public concern.

Similarly, in *Cochran v. City of Los Angeles*, two police officers lodged internal complaints about their supervisor's work ethic, questioned her "ability to make decisions free from personal bias or preferences, and undermined her

---

[1]The *Robinson* district court also concluded that three of the reported incidents involved only unprotectable "individual personnel disputes," *Robinson*, 566 F.3d at 822, including an incident of "verbal abuse" by a lieutenant "toward Robinson in front of numerous [Office of Public Safety] employees because Robinson complained when [the lieutenant] sent two officers home," *Robinson v. County of L.A.*, No. CV-06-2409-GAF, slip op. at 3 (C.D. Cal. Aug. 7, 2007). Unlike Desrochers and Lowes, however, Robinson did not demonstrate that this incident was part of a broader pattern of abuse that impacted the operational efficiency of the department. Therefore, we affirmed the district court's finding that this speech did not involve a matter of public concern. *See Robinson*, 566 F.3d at 822.

authority." 222 F.3d 1195, 1200 (9th Cir. 2000). While we ultimately concluded that the speech was unprotected because the plaintiffs' interest in the speech was "outweighed by the City's interest in preserving discipline and harmony," *id.* at 1199, we found that "the speech here did concern matters which are relevant to the public's evaluation of its police department," even though it was "focused on one employee and not addressed directly to the public," *id.* at 1200. These precedents firmly establish that reports of police officer behavior that impedes the proper operation of a police force are matters of public concern, even when made internally. Viewing the sergeants' complaints about Kimball's destructive managerial approach in this context, it is clear that their speech should be similarly protected.

Further, numerous cases provide relevant examples of protected speech that concerns the performance, functioning, and mismanagement of government agencies. In *Lambert v. Richard*, a library employee who was also a union representative read a prepared statement at a city council meeting criticizing the management style of her supervisor, Richard, due to whom "the library was 'barely' functioning" and "employees who dealt regularly with the public were performing 'devoid of zest, with leaden hearts and wooden hands.' " 59 F.3d 134, 136 (9th Cir. 1995). We concluded that "[g]iven that operation of a public library is among the most visible of the functions performed by city governments, Lambert had a Constitutional right—and perhaps a civic duty—to inform the council if library service was jeopardized by poor management at the top." *Id. Lambert* stands for the proposition that poor management of a publicly visible agency—like a police department—that negatively affects the functioning of the agency is a matter of public concern.[2] It also establishes that

---

[2]The majority distinguishes *Lambert* on the ground that the public debate about Richard's management style was already ongoing. Maj. Op. 8699-8700. We did note that Lambert's statement was made in the context of protests alleging that "Richard mismanaged the library department and

allegations of illegal misconduct are not required, undermining the majority's contention that "misconduct" needs to mean what they think it means—i.e., "actual or potential wrongdoing or breach of public trust." Maj. Op. 8691 n.8 (internal quotation marks omitted).

In yet another case, the unit chief of a Veteran's Administration ("VA") hospital "reported wastefulness, mismanagement, unethical conduct, violations of regulations, and incompetence to his superiors and to administrative personnel," *Roth*, 856 F.2d at 1403, noting that he did so "for the good of the institution," *id.* at 1406. Just as "[i]t can hardly be doubted that the efficient and ethical operation of the VA and the VA's compliance with applicable rules and regulations are inherently of interest to the public," *id.*, Kimball's alleged noncompliance with internal SBPD policies make the sergeants' speech a matter of public concern.

The majority states that "our sister circuits have suggested" to the contrary. Maj. Op. 8694. The cases cited by the majority, however, establish only that speech is not of public concern when the employee complains of management issues that do not implicate the effective operation and provision of public service. *See Brooks v. Univ. of Wis. Bd. of Regents*, 406 F.3d 476, 480 (7th Cir. 2005) (medical researcher complained about his "ability to operate as he saw fit," which constituted "infighting for control of a [clinical] department" and was not related to "patient welfare"); *Kennedy v. Tangipahoa Parish*

treated employees in an abusive and intimidating manner," and that there was "no question that Richard's management style had become an issue of significant public concern by the time Lambert spoke." *Lambert*, 59 F.3d at 136. What is important, however, is not the timeline of the public's awareness, but the fact that Richard's problematic management style did constitute an issue of public concern. It would be nonsensical to provide protection only to employee statements made on topics already of public concern and deprive other employees of protection because they are among the first to highlight a problem at a governmental agency.

*Library Bd. of Control*, 224 F.3d 359, 374 (5th Cir. 2000) (noting cases in which personally aggrieved employees criticized their superiors), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Taylor v. Carmouche*, 214 F.3d 788, 789 91 (7th Cir. 2000) (employees complained about their supervisor in the context of long-term personal disputes about medical leave and professionalism); *Gardetto v. Mason*, 100 F.3d 803, 814 (10th Cir. 1996) (employee complained about the restructuring of her office).

Issues of performance, discipline, and morale in public safety organizations are especially matters of public concern, given the direct impact of such entities on the well-being of the public. In *McKinley*, a police officer who was also a union representative discussed police salaries at a city council meeting and gave a television interview regarding the dispute between the city and the police department. 705 F.2d at 1112. We held that this speech constituted a matter of public concern because salaries affect the ability of the city to attract and retain qualified police personnel, and "the competency of the police force is surely a matter of great public concern." *Id.* at 1114. Certainly, if police salaries are deemed a matter of public concern because they indirectly affect police competence, then speech that directly addresses police competence must also satisfy this element. In light of our precedent, it is particularly incomprehensible why the majority opines that "a reader struggles in vain to discover where or how the proper functioning of the police department was jeopardized by the actions of Kimball." Maj. Op. 8692. In *McKinley*, we also concluded that "the interrelationship between city management and its employees is closely connected with 'discipline and morale in the workplace'—factors that 'are related to an agency's efficient performance of its duties.' " 705 F.2d at 1114 (quoting *Connick*, 461 U.S. at 148). It is undisputed even by the majority that the sergeants' speech concerns morale in the police workforce, Maj. Op. 8699; therefore, *McKinley* is controlling and requires us to conclude that the sergeants' speech was of public concern.

Moreover, as long as the public can draw its own inferences, an employee's speech need not spell out all the aspects of public concern. In *Gillette*, a firefighter was called to a house where someone was allegedly suffering from a drug overdose; pursuant to city policy, fire and medical personnel took the victim against his will and without notification to the hospital. 886 F.2d at 1195-96. During the course of these events, the firefighter communicated to his coworkers his disagreement with the handling of the situation. *Id.* at 1196. We concluded that Gillette's speech was a matter of public concern because it "concerned the manner in which police and fire fighters performed their duties on a particular occasion." *Id.* at 1197. We explained that Gillette's "comments may well raise questions concerning whether persons should be taken to the hospital against their will, what notice they should receive, and what degree of force is appropriate." *Id.* at 1198. Similarly, here, the sergeants' statements originally concerned the behavior of one lieutenant and later broadened to concern the SBPD's handling of these issues. Nonetheless, contrary to the majority's minimizing descriptions of the grievances as concerning only "a poor working relationship" between the sergeants and Kimball, Maj. Op. 8690 n.7; *id.* at 8695 n.14; *see also id.* at 8691 n.8, the sergeants' speech raised questions about the effect of Kimball's management style on the efficient operation of the SBPD, on the SBPD's capability to cooperate with other departments when necessary, and, ultimately, on its ability to achieve its mission—assuring the public safety.

Most troubling is the majority's misapplication of the summary judgment standard. Despite acknowledging that "our inquiry" is "fact-intensive," Maj. Op. 8703 n.27, it has chosen a characterization of the sergeants' speech by finding some facts and disregarding others—in essence, substituting itself for the jury. The simple fact that the majority cites some portions of the record to conclude that the speech did not involve a matter of public concern, while the dissent cites the remain-

ing portions to demonstrate that it did, indicates, at the very least, that summary judgment on this issue is inappropriate.

We have rejected the majority's type of analysis in cases like *Johnson*, where an administrative assistant in the county Department of Environmental Services made statements "to coworkers and others accusing [her supervisor] of misman-agement and possible criminal conduct." 48 F.3d at 421. We concluded "that misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern." *Id.* at 425. Though the county emphasized that Johnson did not go to the press and was motivated by a desire to unseat the supervisor whose job she sought, Johnson "present[ed] evidence to show that she was motivated by a genuine interest in the welfare of [county resources] and a righteous indignation of [her super-visor]'s inadequate job performance." *Id.* We concluded that because these facts were disputed, summary judgment on the issue of public concern was not appropriate. *Id.* at 425-26. Similarly, here, the defendants raise factual questions regard-ing the sergeants' motivation for the speech—questions that should be resolved by a trier of fact.

In stark contrast to the facts presented here stand cases in which courts have found the public employee's speech not related to a matter of public concern. In the leading Supreme Court case, *Connick*, a disgruntled assistant district attorney who was opposed to a transfer circulated an internal question-naire to her coworkers regarding office policies and morale. 461 U.S. at 141. Characterizing her speech as an "attempt to constitutionalize the employee grievance," *id.* at 154, the Court held that Myers's speech was not on a matter of public concern because the purpose of the questionnaire was only to "gather ammunition for another round of controversy with her superiors," *id.* at 148. *Connick*, however, is wholly distin-guishable on its facts. It is undisputed that at the time of filing the grievance, Desrochers and Lowes were secure in their positions—both have been with the force for over twenty

years and had no intention (or prospect) of using the grievance process in a self-interested manner. This conclusion is buttressed by the fact that the sergeants continued their grievance process even though Kimball left his position as their supervisor. Had the sergeants been engaged in workplace "power struggles," *Tucker*, 97 F.3d at 1210, or a "running spat" with Kimball, as the majority suggests, Maj. Op. 8698, they would have given up at that point. Even more persuasive are the remedies that the sergeants sought—the institutional and policy changes they requested unmistakably signify an effort to highlight and solve problems with the culture of the department and not a conflict concerning only the "employee's bureaucratic niche." *Tucker*, 97 F.3d at 1210 (internal quotation marks omitted). That the sergeants refused to sign the initial resolution letter because the institutional remedies they requested were not implemented militates toward the same conclusion—the sergeants were not asserting their own personal grievances but bringing to the attention of the administration pervasive problems within the police force due to the abusive management style of the officer in charge of the unit.

The majority's disparaging comparison of the sergeants' speech to complaints regarding law clerk coffee breaks apparently originates from *Havekost*, in which a grocery bagger in a Navy commissary circulated a petition to other baggers regarding "an internal dispute over the Navy's dress code, scheduling, and responsibility for certain lost commissary profits." 925 F.2d at 319. Characterizing the speech as the "minutiae of workplace grievances," we concluded that it did not meet the public concern test. *Id.* Comparing Havekost's concerns to coffee breaks was fitting under the circumstances, since one of Havekost's concerns was scheduling. *Id.* In contrast, the comparison is strikingly ill-adapted here, where police officers raise questions regarding the operational efficiency of a police force. Given the importance of a competent police force to the safety of a community, moreover, neither is the sergeants' speech similar to the "inter-office transmittal of case citations and summaries," *Roe*, 109 F.3d at 585, that

we concluded was not a matter of public concern because it was an "internal dispute with no wider societal implications," *id.* at 586.

Similarly unwarranted is the majority's comparison of the sergeants' grievance filings to "workplace gripe[s] exchanged around the water cooler," Maj. Op. 8695, and its description of the sergeants' speech as " 'mere[ly an] extension[ ]' of the running spat between the sergeants and Kimball," *id.* at 8698 (alterations in original) (quoting *Voigt*, 70 F.3d at 1560). In *Voigt*, a court employee voiced internal "criticism regarding the way Judge Savell handled two internal personnel matters." 70 F.3d at 1560. We characterized Voigt's concern "primarily as an extension of his personal dispute with Judge Savell in which Voigt attempted to galvanize support for himself by weakening staff support for Judge Savell."[3] *Id.* That Desrochers and Lowes took the situation sufficiently seriously to follow formal grievance procedures distinguishes this case from *Voigt* and from the "water cooler" scenario. The sergeants were not simply complaining about Kimball's disagreeable nature to their coworkers but were instead seeking to address with the administration the negative impact of Kimball's management style on the operation of the police force.

The majority also emphasizes that the sergeants' speech was internal instead of directed to the public. Maj. Op. 8695-96. Courts have repeatedly held, however, that the fact that an employee "expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work." *Garcetti v. Ceballos*, 547 U.S. 410, 420

---

[3]The majority discounts the fact that, despite labeling Voigt's speech a "personal dispute," we held that the speech "can be characterized as touching on a matter of public concern" because "[t]he public has an interest in knowing whether the court treats its job applicants fairly." *Voigt*, 70 F.3d at 1560.

(2006); *see also Connick*, 461 U.S. at 146. "Neither the [First] Amendment itself nor [the Supreme Court's] decisions indicate that . . . freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979); *see also Chateaubriand v. Gaspard*, 97 F.3d 1218, 1223 (9th Cir. 1996) (O'Scannlain, J.) ("The form of the speech—complaints to staff and superiors rather than to the general public—does not remove it from the realm of public concern."); *Gillette*, 886 F.2d at 1198 (concluding that Gillette's speech involved a matter of public concern even though it "was not directed to the public at large" because a public audience "is not critical to the inquiry of whether the speech involves a matter of public concern" (citing *Rankin v. McPherson*, 483 U.S. 378, 386 n.11 (1987))). Finally, given that the sergeants' superiors were best placed to address the problems arising from Kimball's effect on the department, it made sense for the sergeants to follow internal grievance procedures. "Bringing problems to the attention of responsible governmental administrators is at least as important a communication for promoting democratic self-government as disclosure to the citizenry as a whole." *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992). Indeed, a requirement that all concerns of government mismanagement affecting the provision of public services be aired publicly before being raised internally could prove quite counterproductive.

I would not hold that all of the sergeants' speech constitutes a matter of public concern. The sergeants do not attempt to show how Lieutenant Boom's alleged inappropriate comments affected the competency of the police force. Complaints regarding Captain Mankin's promotion appear to concern the internal distribution of power and not the effectiveness of the organization as a whole. The sergeants' statements regarding Captain Mankin's and Chief Billdt's inaction in response to their complaints are more troubling. Like Robinson's communications following up on his reports of mis-

conduct, the sergeants' statements "did not merely contain passing references to public safety [that] were incidental to the message conveyed," but, in discussing the negative impact of Kimball's behavior, "related to the danger the misconduct posed and the need to respond to it." *See Robinson*, 566 F.3d at 823 (alteration in original) (internal quotation marks omitted). The sergeants' speech regarding Captain Mankin's and Chief Billdt's response to their complaints thus "clearly addressed at least two matters of public concern: the misconduct itself and the distinct question of whether the investigating officers were . . . sweeping misconduct under the rug." *Id.* Therefore, the sergeants' speech can be fairly considered to relate to a matter of public concern. Because the district court entered judgment only on the public concern element of the five-step retaliation claim, I would reverse and remand for the district court to consider the remaining elements, including whether the defendants are entitled to qualified immunity. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").