Stanley D. COCHRAN; Dean Anderson, Plaintiffs–Appellees,

v.

CITY OF LOS ANGELES, Defendant–Appellant.

No. 98–56834

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 3, 2000.

Filed Aug. 17, 2000.

Janet G. Bogigian, Deputy City Attorney, City Attorney's Office, Los Angeles, California, for the defendant-appellant.

Mark MacCarley, MacCarley & Rosen, PLC, Glendale, California, for the plaintiffs-appellees.

Before: HUG, Jr., Chief Judge, FERGUSON, Circuit Judge and RESTANI, Judge, United States Court of International Trade.[*]

RESTANI, Judge:

Plaintiffs-appellees are Los Angeles Police Department ("LAPD") sergeants who alleged retaliation by their employer for exercise of First Amendment Rights. Defendant-appellant, the City of Los Angeles ("the City"), was found liable for damages under 42 U.S.C. § 1983 (1994) following a jury trial. Appellant asserts it is entitled to entry of judgment in its favor as a matter of law, because any public concern content of appellees' speech was outweighed by the City's interest in the proper functioning of its police department. We agree.

[*] Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

*FACTS*

The events relevant to this case occurred at the Foothill Division of the LAPD.[1] In March, 1993, Sergeant Stanley Cochran voluntarily transferred to Foothill. Cochran, a 23–year veteran of the LAPD, was assigned as Patrol Supervisor to train and supervise other officers. In April, 1993, Lieutenant Kathy Age arrived at Foothill as a Day Watch Commander. She became Cochran's immediate supervisor a few months later.

Cochran and Age did not develop a positive working relationship. Cochran believed that Age had a bad work ethic because she would leave work early to do administrative work at home. He was also troubled by comments of Age that suggested she would seek revenge against an officer who had filed a complaint about her. Cochran further disapproved of the manner in which Age reacted to an incident where an officer in her division had shot himself. Finally, racial and gender issues (Cochran was a white male officer and Age was a black female officer) may have negatively impacted the working relationship.

Cochran's and Age's troubles with each other escalated in February, 1994, when two officers reported to Cochran that they had seen Sergeant Cato, a black male officer, sleeping in his patrol car. Cochran reported the incident to Age, but did not reveal the names of the reporting officers. Age then confronted Cato, who denied that he had been sleeping. Age was dissatisfied with Cato's explanation, and so she reported the incident to her then supervisor, Captain Ornelas. Ornelas ordered Age to counsel Cato, but did not order Age to interview the reporting officers. According to Cochran, however, Age told him that she had interviewed the reporting officers, and that the officers had recanted their accusations. The officers told Coch-

ran that this purported interview and recantation did not occur.

In March, 1994, Sergeant Dean Anderson, Cochran's best friend, transferred to Foothill and was placed on the graveyard shift. After a short time he was assigned to be the Complaint Sergeant, and he reported directly to Captain Robert Gale, who had replaced Captain Ornelas. Anderson's job was to investigate citizen and officer misconduct claims against police officers. Within the first few months of taking this job, Anderson, who is a white male officer, also developed problems with Lieutenant Age.

Anderson made several reports regarding Lieutenant Age. He reported to Captain Gale that two other white male officers complained to him that Age was giving white officers less favorable reports than she was giving black officers. Anderson repeatedly asked Gale to conduct an investigation, and he warned that racial tensions were worsening at Foothill, but Gale did not take direct action at that time. Anderson later reported to Gale that Age had been leaving work early to do administrative work at home, but that she had not been assigned any administrative work at the time. When Age was eventually caught and punished, Anderson was dissatisfied because he believed other officers would have received harsher punishments. Finally, Anderson reported to Gale that Age and another officer were improperly interfering with personnel complaints involving minority or female officers.

In June, 1994, a contract dispute arose between the City and the police union. Anderson and Cochran actively supported the union and urged their fellow officers not to work overtime during the upcoming World Cup soccer matches. They also urged other officers to call in sick on a prearranged date—the "blue flu" day.

---

1. The Foothill Division was in a state of some turmoil. In 1992, the Division was heavily criticized as a result of the Rodney King beating and the riots associated with it. In 1994,

the Northridge earthquake badly damaged the station and also added to the stress at Foothill.

One officer, however, ignored the pressure from the police union and signed up for overtime during the World Cup. In response, Cochran and Anderson criticized the officer, who reported the incident. Captain Gale then ordered Age to file a formal personnel complaint. Anderson and Cochran each received five-day suspensions. The Police Department Board of Rights, however, later found Cochran and Anderson not guilty in this incident.

In July, 1994, another event arose that purportedly involved Officer Cato, about whom Cochran had complained to Age in February. Cochran (incorrectly) believed that Cato had made a comment that tended to undermine Cochran's authority when a black officer had left his shotgun unattended in the Foothills station public bathroom. Cochran immediately reported to Captain Gale, who coincidentally had Age in his office at the time. Cochran complained that this incident and the February Cato sleeping incident had not been properly investigated, and that he believed that some minority officers were being given preferential treatment. Gale thought Cochran's complaint was retaliatory in nature, because it occurred after Cochran had been sanctioned for his comments during the union dispute. Gale told Cochran to forget about the February sleeping incident, but ordered Age to investigate the latest shotgun incident. Age interviewed Cato and the officer who left the shotgun in the bathroom, but did not interview the officer who reported Cato's allegedly inappropriate comments to Cochran. Cochran, apparently enraged, wrote in his log on August 26, 1994, that the truth did not matter to Age.

Meanwhile, Anderson was also investigating the shotgun incident and the racial problems at Foothill. He repeatedly reported the racial problems to Gale, with no apparent response. He then went over Gale's head to Captain Ronald Bergmann, the Foothill Area Commanding Officer and to Department Chief Martin Pomeroy, through his adjutant. Anderson was eventually removed from his position as Complaint Sergeant. Anderson, however, continued his investigations.

On September 20, 1994, Cochran was administratively transferred from the Foothill station into the Hollywood station. On the transfer request Captain Gale wrote that Cochran was one of "the most proficient and dedicated supervisors," but that he "allowed his personal frustration and resentment to foster a negative and hostile environment," and that his dislike for his peers and superiors had "created the potential for racial problems." Cochran has not sought any promotions or special assignments since his transfer.

After Cochran was transferred, Anderson continued to investigate the Cato sleeping incident from February, 1994. He taped interviews of the two officers who had originally reported seeing Cato sleeping in his car. On October 7, 1994, Anderson reported on his investigation to Captain Bergmann, who ordered him to stop the investigations and to turn over the tape recorded interviews. A few days later, Bergmann was notified that Anderson had interviewed another officer in connection with the Cato sleeping incident. Bergmann again ordered Anderson to stop the investigation.

A short time later, Anderson was administratively transferred to the Wilshire station. The transfer papers cited Anderson's involvement in the union dispute, as well as his continued investigation of the Cato sleeping incident despite orders to stop. The papers concluded that Anderson had created a hostile work environment at Foothill. Following his transfer to Wilshire, Anderson applied for and was denied several promotions and pay upgrades. At the time of trial, however, he was working as an adjutant to the Captain of Hollywood, which is a coveted position.

Captain Gale also wanted an administrative transfer of Lieutenant Age, but Captain Drulias (Bergmann's predecessor) prevented the transfer. Instead, Age remained at the Foothill station, and even-

tually was removed from patrol responsibilities and given the job of Assistant Commander of Detectives, at the same pay level.

Anderson and Cochran appealed their transfers to the Board of General Appeals. The Board found that the Foothill station had a right to make the transfers, but it recommended that any written materials regarding the transfers be removed from the sergeants' personnel files and that the sergeants be allowed to transfer to a division of their choice. Police Chief Willie Williams was not bound by the recommendation, and he did not authorize the removal of the materials from the sergeants' files or the transfers to a unit of the sergeants' choice. The parties agree that Williams is the highest officer in the LAPD and that he is a policy maker.

### PROCEDURAL HISTORY

Sergeants Anderson and Cochran filed separate complaints in federal district court. In their § 1983 claims, both Anderson and Cochran alleged conspiracy and that the LAPD had improperly retaliated against them for exercising their First Amendment rights to free speech. They also alleged a claim under the California Whistleblower statute, Cal. Lab. Code § 1102.5 (West 1998), against the City. The cases were consolidated, but later the district court granted the defendants' 12(b)(6) motion to dismiss without prejudice. According to the court, the speech that Anderson and Cochran alleged was the basis for the retaliation was not of public concern.

On August 5, 1997, Anderson and Cochran filed second amended complaints, alleging the same three claims. The defendants were tardy in filing a motion for summary judgment, and the case went to trial. During the trial, defendants Pomeroy, Bergmann, Banks and Gale were dismissed, leaving only the City and Chief Williams as defendants. At the close of Plaintiff's evidence, the defendants, arguing again that the plaintiffs' speech was not protected because it was not of public concern, moved for judgment as a matter

of law. This motion was denied. The defendants made the same motion at the close of their evidence, which the court again denied.

The jury returned a general verdict in favor of Anderson against the City and awarded him damages of $100,000. The jury also found in favor of Cochran against the City, and awarded him damages of $75,000. The jury found in favor of Chief Williams on both Cochran's and Anderson's claims against him. The district court entered judgment based on the jury's verdict and awarded Cochran and Anderson attorneys fees pursuant to 42 U.S.C. § 1988 (1994).

### DISCUSSION

#### I. Standard of Review

This court reviews the denial of a motion for judgment as a matter of law *de novo*. *See Saman v. Robbins*, 173 F.3d 1150, 1155 (9th Cir.1999); *Marcy v. Delta Airlines*, 166 F.3d 1279, 1282 (9th Cir. 1999).

#### II. 42 U.S.C. § 1983 Retaliation Claim

We assume for the sake of argument that appellees' lateral transfers accompanied by negative statements constitute adverse employment action sufficient to give rise to a wrongful retaliation claim under 42 U.S.C. § 1983. *See Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) ("Mere threats and harsh words are insufficient [to establish adverse employment action]."); *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994) ("[D]amage to reputation is not actionable under § 1983 unless it is accompanied by 'some more tangible interests[.]' ") (*quoting Patton v. County of Kings*, 857 F.2d 1379, 1381 (9th Cir.1988)). We focus instead on whether appellees' speech was of public concern and whether appellees' interest in such speech was outweighed by the City's interest in preserving discipline and harmony within the LAPD.

■ This issue is one of law and a determination is to be made by the court. *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ("The inquiry into the protected status of speech is one of law, not fact."); *Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Nunez v. Davis,* 169 F.3d 1222, 1226 n. 1 (9th Cir. 1999), *cert. denied* —— U.S. ——, 120 S.Ct. 932, 145 L.Ed.2d 811 (2000). This issue does not concern the sufficiency of the evidence presented to the jury. Therefore appellant's failure to renew post-verdict the motion for judgment as a matter of law made at the close of evidence does not prevent our review and reversal in favor of appellant. *See Patel v. Penman,* 103 F.3d 868, 879–80 (9th Cir.1996) (identity of municipal decision-maker is an issue of law; appellate court may decide without post-verdict renewal of motion); *Landes Constr. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1370 (9th Cir.1987) ("As long as a party properly raises an issue of law before the case goes to the jury, it need not include the issue in a motion for a directed verdict in order to preserve the question on appeal.")

■ Whether a public employee's speech or expressive conduct involves a matter of public concern depends upon "the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. A public employee's speech or expressive conduct deals with a matter of public concern when it "can be fairly considered as relating to a matter of political, social, or other concern to the community." *Voigt v. Savell,* 70 F.3d 1552, 1559 (9th Cir.1995). "Speech that deals with 'complaints over internal office affairs' is not protected when it is not relevant to the public's evaluation of a governmental agency's performance." *Nunez v. Davis* 169 F.3d at 1227 (quoting *Connick,* 461 U.S. at 149, 103 S.Ct. 1684).

■ Although focused on one employee and not addressed directly to the public, the speech here did concern matters which are relevant to the public's evaluation of its police department. In determining a public employee's rights to free speech, however, "courts must strike a balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Nunez v. Davis,* 169 F.3d at 1228 (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The employer's interest outweighs the employee's interest in speaking "if the employee's speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Id.* (quoting *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

■ The City had a significant interest in responding to the appellees' speech. First, the appellees' speech "impair[ed] discipline by superiors." *Id.* The appellees' statements directly challenged Lieutenant Age's ability to make decisions free from personal bias or preferences, and undermined her authority. Anderson's speech and actions also tended to undermine Captain Gale's and Captain Bergmann's authority. First Anderson brought his investigations to the attention of Captain Bergmann over Captain Gale's head. Second, Anderson further undermined Captain Bergmann, if not by directly disobeying his orders to stop the investigation, then by taking actions that ignored the spirit of the orders. Captain Gale testified that the lack of discipline on the part of both officers was crucial to his decision to transfer them. Furthermore, a government employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking ac-

tion." *Connick*, 461 U.S. at 152, 103 S.Ct. 1684.

Second, the nature of the speech was conducive to racial and gender tension, and several witnesses testified to the development of "camps" of people, often based on race or gender, within the Foothill station that would disrupt the "harmony among coworkers." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. This disharmony seems particularly troubling in a police station, where "personal loyalty and confidence" are essential to the "close working relationships" among the officers. *See id.*

Finally, the time, place and manner of the employees' speech is also relevant. *See Connick*, 461 U.S. at 152, 103 S.Ct. 1684. In this case, although the appellees made their direct accusations against Lieutenant Age privately to Captain Gale, they interviewed other police officers regarding the alleged incidents of favoritism, thus making their beliefs known to other officers who were subordinate to Lieutenant Age. Moreover, the speech was not directed to the public so that it independently could assess the functioning of the police department. The speech, while touching on racial and gender equality issues, largely involved internal office matters, particularly one supervisor—Lieutenant Age, and apparently stemmed, at least on Cochran's part, from personal concerns. Cochran disliked Lieutenant Age from the beginning of their relationship. Cochran also did not complain to Captain Gale until after Cochran had been reprimanded in the union dispute.[2]

Anderson was a close friend of Cochran's and they expressed the same concerns. Additionally, Anderson's continued unwillingness to accept his superiors' disposition of his complaints bordered on insubordination and raised both workplace discipline and disruption considerations.

There are a range of acceptable dispositions of complaints against police officers. It should have been expected that the appellees' superiors would take action when the appellees refused to accept the dispositions selected by their superiors, whether or not those decisions were based on the correct understanding of the facts of the complaints.[3]

> The restrictions [on employee speech] are allowed not just because the speech interferes with the government's operation. Speech by private people can do the same, but this does not allow the government to suppress it.
>
> ... [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [the employee].

*Waters*, 511 U.S. at 674–75, 114 S.Ct. 1878.

As indicated, the unit of government in which appellees worked was a police department, a quasi-military organization. Discipline and esprit de corps are vital to its functioning. Given that "a wide degree of deference to the employer's judgment is appropriate" when "close working relationships are essential to fulfilling public responsibilities," the balance of interests tips in favor of the City. *Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684. Thus, we find that appellees' speech, while of some public concern, is not protected speech and appel-

---

**2.** Appellees' main complaints about Age—that she did not adequately investigate the Cato sleeping incident or the Cato shotgun incident—were based on hearsay accusations against Cato.

**3.** Appellees did not appeal the denial of qualified immunity and we do not address the objective reasonableness of the employer's action. If the speech at issue is not protected, no actionable constitutional violation occurred.

lee's 42 U.S.C. § 1983 claim must be dismissed.

### III.  California Labor Code § 1102.5[4]

 A general jury verdict must be supported by substantial evidence to support each and every theory underlying it. *Knapp v. Ernst & Whinney,* 90 F.3d 1431, 1439 (9th Cir.1996). There are narrow exceptions to this rule. We may exercise our discretion to uphold the verdict if, *inter alia,* it is likely that the jury was not confused and the evidence for the plaintiff was strong on the remaining theory. *See, e.g., Kern v. Levolor Lorentzen, Inc.,* 899 F.2d 772, 777 (9th Cir.1990); *Traver v. Meshriy,* 627 F.2d 934, 938–39 (9th Cir. 1980).

■ First, the seeming inconsistency between the verdicts against the City and in favor of Williams, the decision-maker acting on behalf of the City, indicates jury confusion. *See Poppell v. City of San Diego,* 149 F.3d 951, 971 (9th Cir.1998) (finding municipal liability hinged on chief policymaker's liability).[5]

Second, the statute at issue has not been applied to state agencies. *See Stiesberg v. California,* 80 F.3d 353, 358 (9th Cir.1996) (addressing claim on public policy grounds, but noting lack of application of statute to state agencies.)[6] Nor has it been decided whether the exclusion of reports to employers from the scope of the statute applies if the employer receiving the report is a law enforcement agency. *See Green v. Ralee Eng'g Co.,* 19 Cal.4th 66, 78 Cal. Rptr.2d 16, 960 P.2d 1046, 1052 (1998) (reports to private employers not within

scope of statute). We decline to address these issues for the first time on appeal. Thus, we do not exercise our discretion to uphold these problematic verdicts based on the state law theory of liability.[7] We remand to the district court for disposition of the state law claims.

REVERSED and REMANDED.

---

4. California Labor Code section 1102.5(b) provides:

No employer shall retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation.

Cal. Lab.Code § 1102.5.

5. For this limited purpose we need not decide whether it is possible to overlay the verdicts

with a construction which could reconcile them. It is enough that inconsistency is a substantial concern.

6. Plaintiffs have not made a public policy claim.

7. If the district court decides, in its discretion, not to dismiss the remaining supplemental state law claims under 28. U.S.C. § 1367(c) (1994), it must address the underlying legal issues before proceeding with a new trial on such claims.