**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| DOUGLAS CAMPBELL THOMSON; JOHN ANTHONY HELLIWELL; ROBERT LAYNE SIEBENBERG, | No. 24-2858 |
|  | D.C. No. 2:21-cv-08124-AB-MRW |
| *Plaintiffs - Appellants*, |  |
| v. | OPINION |
| CHARLES ROGER POMFRET HODGSON, AKA Roger Hodgson; DELICATE MUSIC, a California general partnership, |  |
| *Defendants - Appellees*. |  |

Appeal from the United States District Court
for the Central District of California
André Birotte, Jr., District Judge, Presiding

Argued and Submitted May 23, 2025
Pasadena, California

Filed August 20, 2025

Before: Kim McLane Wardlaw and John B. Owens, Circuit

Judges, and John Charles Hinderaker, District Judge.[*]

Opinion by Judge Wardlaw

## SUMMARY[**]

### California Contract Law

The panel reversed the district court's judgment, after a jury trial, in favor of the defendants in a breach of contract action brought by former members of the rock band Supertramp against their former bandmates and a publishing company.

In 1977, the parties entered into a publishing agreement that allocated specific percentages of songwriting royalties among the band members and their manager. The royalties were distributed in the manner prescribed by the agreement until 2018, when defendants stopped paying the royalties due the plaintiffs. The district court ruled as a matter of law that defendants were entitled to unilaterally terminate the agreement after a "reasonable time."

The panel explained that California courts conduct a three-step analysis to determine a contract's duration. First, courts examine whether the contract contains an express duration. Second, if the contract does not contain an express

---

[*] The Honorable John Charles Hinderaker, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

duration, courts ask whether one can be implied from the nature and surrounding circumstances of the contract. Third, if the contract contains no express or implied duration, the court construes the duration to be a reasonable time. Here, at step one, the panel agreed with the district court that there was no express duration to the contract. At step two, however, the panel concluded that a duration could be implied: when the copyrights in the works cease generating publishing royalties because they fall into the public domain. Thus, the panel held that the district court erred at step two and should not have reached step three, and there was no issue remaining for the jury to decide. The panel therefore reversed the district court and remanded with instructions to enter judgment in plaintiffs' favor on the issue of liability, and for any further proceedings consistent with this opinion.

## COUNSEL

David L. Burg (argued) and Anjani Mandavia, Mandavia Ephraim & Burg LLP, Los Angeles, California, for Plaintiffs-Appellants.

Robin Meadow (argued) and Tina Kuang, Greines Martin Stein & Richland LLP, Los Angeles, California; Alan S. Gutman and Matthew E. Hess, Gutman Law, Beverly Hills, California; for Defendants-Appellees.

# OPINION

WARDLAW, Circuit Judge:

Douglas Thomson, John Helliwell, and Robert Siebenberg ("Plaintiffs"), former members of the world-renowned rock band Supertramp, brought this breach of contract action against their former bandmates Rodger Hodgson and Rick Davies, as well as Delicate Music, a sub-publishing company formed by Hodgson and Davies ("Defendants"). In 1977, the parties entered into a publishing agreement which allocated specific percentages of songwriting royalties among the band members and their manager, David Margereson. The royalties were distributed in the manner prescribed by the agreement until 2018, when Hodgson and Davies—Supertramp's principal songwriters—said "Goodbye Stranger," [1] and abruptly stopped paying the songwriting royalties due Plaintiffs. The ensuing dispute proceeded to a jury trial, during which the district court ruled as a matter of law that Defendants were legally entitled to unilaterally terminate the agreement after a "reasonable time" because "the contract contains no express duration nor has sufficient evidence been presented that there can be an implied duration based on the surrounding circumstances, including execution of or the nature of the '77 agreement specifically."

On appeal, Plaintiffs ask that Defendants continue to "Give A Little Bit"[2] of Supertramp's songwriting royalties until the band's songs cease generating revenue. But

---

[1] Supertramp, *Breakfast in America* (A&M Records Mar. 16, 1979).

[2] Supertramp, *Even in the Quietest Moments…* (A&M Records Apr. 8, 1977).

Defendants believe that "From Now On," [3] they are no longer obligated to share royalties because the publishing agreement was terminable after a reasonable time. We agree with Plaintiffs, and reverse and remand with instructions to enter judgment in Plaintiffs' favor on the question of liability.

## I.

### A.

Douglas Thomson, John Helliwell, Robert Siebenberg, Rodger Hodgson, and Rick Davies made up the iconic rock band Supertramp, a music group at the height of its popularity from the mid-1970s into the early 1980s.

Hodgson and Davies were the principal songwriters in Supertramp and credited as the authors of Supertramp's songs. Supertramp's records generate two distinct streams of revenue: (1) "record royalties," which are generated from the sale of the album itself or the CD or the cassette itself, and (2) songwriting or publishing royalties, which is the revenue that is generated by the publishing of those songs that are contained on those records. The band shared the record royalties equally, but only Hodgson and Davies, as songwriters, were entitled to the publishing royalties.

Supertramp's label A&M Records provided and paid for the expenses that the band couldn't afford to pay in their early years, and then recouped its money from Supertramp's record royalties. The band members would not earn any record royalties until their debts to A&M were repaid. Unlike the record royalties, the publishing royalties were the

---

[3] Supertramp, *Even in the Quietest Moments…* (A&M Records Apr. 8, 1977).

only unencumbered stream of revenue that wasn't owed back to A&M while Supertramp was still in debt.

As a result of this arrangement, Plaintiffs found themselves hurting financially during the 1970s despite Supertramp's success, while Hodgson and Davies found their financial situations improving. At some point before January 1977, Plaintiffs expressed their concern to Defendants that, although the band had released two best-selling albums, and despite the importance of Plaintiffs' contribution to Supertramp's success, Plaintiffs were receiving no payment for their efforts because all recording royalties and tour revenues were used to reimburse A&M Records for the band's expenses. In response to these concerns, Supertramp's manager David Margereson presented the band with a publishing agreement ("the 1977 Agreement"), which allocated specific percentages of publishing royalties among the band members and Margereson. The 1977 Agreement contained the following key provisions:

> 2. The parties hereby agree that effective January 1, 1977, all song writing and publishing royalties (and/or other income) derived from the parties' songwriting and/or publishing activities shall be allocated in the following manner: . . .
>
> (b) On any compositions recorded by the performing group Supertramp the net writing and publishing income derived from said recordings (herein, the "shared publishing income"), without any management commission payable to David Margereson,

shall be paid to each of the undersigned in the following proportions:

| | |
|---|---|
| Roger Hodgson | 27% |
| Richard Davies | 27% |
| Douglas Campbell Thomson | 11.5% |
| John Anthony Helliwell | 11.5% |
| Robert Layne Siebenberg | 11.5% |
| David Margereson | 11.5% |

The band members and Margereson agreed that the publishing royalties would be collected, administered, and distributed by Delicate Music, Hodgson and Davies's joint sub-publishing company. Hodgson testified that he agreed to allocate the publishing royalties because he wanted "[t]o keep the band functioning and happy" and "want[ed] the band to be successful" and to keep "[t]ouring." Siebenberg, however, testified that there was no discussion that "the song income sharing was only going to last until record royalties started being paid" during or after the January 1977 meeting in which Margereson presented the 1977 Agreement to the band, or during the December 1977 meeting in which the 1977 Agreement was ultimately signed. The 1977 Agreement did not designate an end date or indicate that it would continue in perpetuity.

In 1979, the band released its fourth album, *Breakfast in America*, which sold over 30 million copies worldwide. On the heels of the album's success, Supertramp entered into the most lucrative record deal in Supertramp's history with A&M. It was only after *Breakfast in America*'s release that the band members finally began earning recording royalties. Following the success of the album, the band orally amended

the 1977 Agreement in 1983 to provide that Hodgson and Davies would each receive 32.15% of the publishing revenue, and Plaintiffs and Russel Pope, the band's sound engineer, would each receive 7.14% of the publishing revenues from the exploitation of the songs on the band's most recent album, *Famous Last Words.* The revenue splits for the earlier albums remained the same.

In 1983, Hodgson, Margereson, and Pope left Supertramp. As part of Margereson's exit, he and his management company entered into a written agreement with the band setting forth the band's "continuing obligation" to share certain percentages of its revenues and assets with Margereson's management company. The parties agreed that Margereson's management company would be entitled to receive "in perpetuity" 7.14% of all publishing royalties derived from songs on *Famous Last Words*, and 11.5% of publishing royalties derived from the band's other recordings. These percentages were the same percentages owed to Margereson under the 1977 Agreement. Similarly, Pope entered into a withdrawal agreement that also included his right to "continue to receive from Delicate, in perpetuity" the same percentage specified in the amended 1977 Agreement—7.14%. Hodgson's withdrawal agreement ("1984 Agreement") also stated that he would continue to receive the publishing royalties allocated to him under the 1977 Agreement.

Paragraph 7.5 of the 1984 Agreement required Hodgson to pay to Delicate Music all publishing revenue paid directly to Hodgson for the exploitation of the "Delicate Compositions"—i.e., the songs subject to the 1977 Agreement—to facilitate the distribution of publishing revenue allocated to the other parties by the 1977 Agreement as amended.

In 1991, the parties entered into an agreement ("1991 Agreement") modifying certain aspects of the songwriting and publishing royalties owed to them under the previous agreements. The 1991 Agreement confirmed the share of songwriting and publishing royalties due to Plaintiffs under the 1977 and 1984 Agreements. The 1991 Agreement also provided that the publishing royalty allocations payable to each party under the 1991 Agreement would remain the same "in perpetuity" as their contractual allocations under the amended 1977 Agreement.

## B.

The publishing royalties were allocated in a manner pursuant to the 1977 Agreement until 2018, when Defendants suddenly stopped paying Plaintiffs their contractual share of the publishing royalties.[4]

Plaintiffs initially filed a complaint in California state court, but the action was removed by Davies[5] to the Central District of California based on his affirmative defenses and counterclaims under the Copyright Act. Plaintiffs alleged that Defendants had breached three contracts: the 1977 Agreement, the 1984 Agreement, and the 1991 Agreement. The 1977 Agreement is the only contract at issue on appeal.

Plaintiffs moved for summary adjudication, arguing, among other things, that they were contractually entitled to continue receiving "payment under and according to the terms of the parties' valid and enforceable Participation Agreement," which was defined as including the 1977

---

[4] Hodgson made a single one-time payment in 2021 in an attempt to prevent litigation.

[5] Plaintiffs and Davies reached a settlement in April 2023, leaving Delicate Music and Hodgson as the remaining defendants.

Agreement, the 1984 Agreement, and the 1991 Agreement. The district court granted Plaintiffs' motion in part and denied it in part. In doing so, the court identified one remaining issue for trial: "Is (or was) Defendants' obligation to pay Plaintiffs royalty interests (1) terminable at-will; or (2) conferred in perpetuity."

The case proceeded to a jury trial on February 20, 2024, which lasted six days. Defendants filed a motion for judgment as a matter of law under Fed. R. Civ. P. 50 after Plaintiffs rested, and Plaintiffs filed a Rule 50 motion after Defendants rested. Plaintiffs' Rule 50 motion argued that the agreement had an implied end date: "the point at which the composition copyrights at issue cease to generate income." Relevant here,[6] the district court denied Plaintiffs' Rule 50 motion in its entirety and denied Defendants' Rule 50 motion with respect to the 1977 Agreement. In making these rulings, the court stated that it had made the "judicial determination that the contract contains no express duration nor has sufficient evidence been presented that there can be an implied duration based on the surrounding circumstances, including execution of or the nature of the '77 agreement specifically." Thus, the district court determined that the only question to be presented to the jury was whether Defendants "terminated the contract at will, after a reasonable time." The jury answered yes, and judgment was

---

[6] The court also ruled that the 1984 Agreement did not affirmatively obligate Hodgson to distribute publishing revenue to Plaintiffs, and that Delicate Music's obligation in the 1984 Agreement to distribute funds "in perpetuity" applied only to its obligation to pay Hodgson. The court also ruled that Delicate Music was not a party to the 1991 Agreement, nor was Hodgson personally bound by the 1991 Agreement. Plaintiffs do not challenge these rulings in this appeal.

entered against Plaintiffs on April 2, 2024.  Plaintiffs timely appeal.

## II.

We review the denial of a motion for judgment as a matter of law de novo.  *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1199 (9th Cir. 2000).  Questions of law raised before the case went to the jury are reviewed de novo, even following a jury verdict.  *Id.* at 1200; *Marcy v. Delta Airlines*, 166 F.3d 1279, 1282 (9th Cir. 1999).  The construction and enforcement of contracts by federal courts is governed by state law.  *United Com. Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992); *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016) ("contract law is usually a matter of state law").  In California, contract interpretation is a matter of law, and "solely a judicial function, unless the interpretation turns on the credibility of extrinsic evidence."[7] *GGIS Ins. Servs., Inc. v. Super. Ct.*, 168 Cal. App. 4th 1493, 1507 (2008).

## III.

### A.

Under California contract law, the court's "mission in every contract case is to discern and effectuate the contracting parties' mutual intent."  *RMR Equip. Rental, Inc. v. Residential Fund 1347, LLC*, 65 Cal. App. 5th 383, 392 (2021).  If possible, intent should be determined solely from the words of the contract.  But where ambiguity exists, courts may also consider the nature of the contract and the surrounding circumstances to inform the contract's words.

---

[7] This appeal does not involve disputed extrinsic evidence.

*Id.* (citing *Consol. Theatres, Inc. v. Theatrical Stage Emps. Union, Loc. 16*, 69 Cal.2d 713, 725–31 (1968) ("*Consolidated Theatres*")).  We may also consider a party's performance under the contract prior to any dispute as evidence of that party's intent and understanding at the time that it entered into the contract.  *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 393–94 (2008).

Plaintiffs contend that the district court erred in ruling as a matter of law that the 1977 Agreement could be unilaterally terminated after a "reasonable time," because its nature and purpose—a royalty sharing agreement—establishes that Defendants are obligated to share publishing and songwriting revenues for as long as the subject Supertramp songs continue to generate these revenues. Construing the 1977 Agreement in light of California law, we agree.

California courts conduct a three-step analysis to determine a contract's duration.  First, courts examine whether the contract contains an express duration provision. *Consol. Theatres*, 69 Cal.2d at 727.  Second, if the contract does *not* contain an express duration provision, courts determine whether one can be implied from the nature and surrounding circumstances of the contract.  *Id.*  Third, if the "nature of the contract and the totality of surrounding circumstances give no suggestion as to *any ascertainable term*," the court construes the term of duration to be a reasonable time.  *Id.* at 727–28 (emphasis added).  Thus, it is well-established under California law that if a contract contains no express term of duration, *and* the nature and surrounding circumstances of the contract do not permit the court to imply a term of duration, the contract is construed as terminable at will after a reasonable time.  *Id.* at 727–29.

The three-step analysis outlined above is drawn from the California Supreme Court's decision in *Consolidated Theatres*. There, the court was asked to interpret a labor agreement for the employment of musicians for live stage performances in San Francisco movie theaters. *Id.* at 717. The parties entered into the labor agreement at a time when silent films were typically accompanied by live musicians. *Id.* at 729–30. As "talkies" proliferated and the need for live musicians at movie theaters waned, the parties agreed that Consolidated Theatres would be required to employ one musician-turned-stagehand "if any stage presentations are offered for the public" at one of its theaters. *Id.* at 718. Thirty-two years after the initial agreement, the parties disputed whether the agreement was still in effect. At step one, the court determined that there was no express end to the contract. *Id.* at 730. But at step two, the court determined that a duration could be implied from the nature and surrounding circumstances of the contract: "[I]t was the intention of the parties contracting in 1931 to create reciprocal obligations binding upon them as long as there existed a real possibility that the theatres owned and operated by Consolidated might undertake to present live stage performances—and no longer." *Id*. at 730. In other words, the contract obligations continued only so long as the contract's intended subject matter—live music performances—existed.

Here, at step one, the district court determined that the contract contained "no express duration." At step two, the district court determined that no end date could be implied from the nature and "surrounding circumstances" of the contract. Thus, the court proceeded to step three and referred to the jury the question whether Defendants terminated the contract "after a reasonable time." Although the jury entered

a verdict for Defendants at step three, we hold that the court's determination at step two constituted legal error, and thus the court should not have reached step three, *Cochran*, 222 F.3d at 1200, and there was no issue remaining for the jury to decide.

Defendants argue the case could not be resolved at step two because, unlike the labor agreement in *Consolidated Theatres*, "the nature and totality of the circumstances surrounding [the 1977 Agreement] can reasonably imply several *conflicting* terms of duration—resulting in no *ascertainable* term that can be measured in a reasonable manner." Specifically, Defendants contend that the undisputed evidence demonstrates that the parties may have entered into the 1977 Agreement for any number of reasons, all of which could imply a different term of duration. The Defendants offer the following potential durational terms:

- Until Plaintiffs began earning record royalties.

- For as long as Supertramp continued to exist.

- Until the copyrights expired.

- For as long as publishing royalties exist.

But *Consolidated Theatres* does not require that a contract have only *one* possible term of duration. Rather, its test asks whether "the nature of the contract and the totality of surrounding circumstances [suggest] *any* ascertainable term." *Consol. Theatres*, 69 Cal.2d at 727 (emphasis added). Moreover, subsequent California caselaw has clarified that the proper inquiry is not whether an ascertainable event *could* imply termination, but whether

that event "*necessarily* implies termination." *Lura v. Multaplex*, 129 Cal. App. 3d 410, 415 (1982) (emphasis added).

In *Lura*, the parties entered into an agreement stating that the plaintiff would receive a five percent commission on shipments to business accounts that had been procured by the plaintiff. *Id.* at 412. The agreement made no mention of duration, and the parties had not discussed nor reached an understanding as to the contract's duration. *Id.* Several years later, the defendant attempted to unilaterally terminate the commission payments. *Id.* The trial court found that the agreement was of indefinite duration and therefore could be terminated by either party after a reasonable time. *Id.* at 413.

Reversing the trial court, the court of appeal rejected the defendant's contention that the agreement's silence as to duration meant that it extended only for a reasonable time, explaining that "[s]ince [defendant's] obligation to appellant is contingent upon its sales to the accounts he secured, the agreement is of a limited duration—*until [defendant] stops selling to those accounts*." *Id.* (emphasis added). In determining the agreement's duration, the court recognized:

> The important factor, then, is not whether the contract fails to specify a termination date, but whether there is an ascertainable event which necessarily implies termination . . . . [W]here an obligation is conditioned upon an event connected with the subject matter of the

> contract, the obligation continues until that
> event occurs.

*Id.* at 414–15.  The agreement in question in *Lura* contained such an event: the cessation of sales to the accounts procured by the plaintiff.  *Id.* at 415.

So too here.   While the various other "ascertainable events" suggested by Defendants—such as when the Plaintiffs began earning record royalties or so long as Supertramp continued to exist—*could* imply termination of the 1977 Agreement, they do not *necessarily* imply termination as the events in *Consolidated*, *Lura*, or as the cessation of royalties altogether would.  *See also Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 661 (S.D.N.Y. 1959) ("Contracts which provide no fixed date for the termination of the promisor's obligation but condition the obligation upon an event which would necessarily terminate the contract" are not of unlimited duration and thus are not subject to unilateral termination.). Thus, we are persuaded by Plaintiffs' argument that the nature of the 1977 Agreement establishes that the parties' obligations under the contract will exist so long as the "song writing and publishing royalties (and/or other income) derived from the parties' songwriting and/or publishing activities" continue to flow.

Defendants incorrectly characterize this implied durational term as a "perpetual obligation."  Not so.  At some point in the future, the copyrights in the works covered by the 1977 Agreement will expire, and the works will fall into the public domain.  At *this* point, the copyrights will cease to generate publishing royalties, and the obligations created by the 1977 Agreement will terminate.  *See Consol. Theatres*, 69 Cal.2d at 730 (The parties' agreement "was

impliedly conditioned as to duration upon the continued possibility of live stage presentations [and] the disappearance of that possibility terminated all obligations under the contract."). True, this may be many years down the line—but the "mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties." *Lura*, 129 Cal. App. 3d at 413–14 (quoting *Warner-Lambert*, 178 F. Supp. at 661). Thus, we conclude that Defendants have a continuing obligation to share songwriting and publishing royalties with Plaintiffs in accordance with the percentage allocations set forth in the 1977 Agreement, so long as such royalties continue to exist.

## B.

Although the purpose and nature of the 1977 Agreement alone establish its implied duration as a matter of law, we agree with Plaintiffs that Defendants' predispute, postcontracting conduct further supports that the parties intended and understood that they would continue to share in publishing and songwriting revenues for as long as the subject Supertramp songs continue to generate such revenues. "[A] party's predispute, postcontracting conduct is powerful evidence of that party's intent and understanding of the contract at the time it entered into the agreement." *Gilkyson v. Disney Enters., Inc.*, 66 Cal. App. 5th 900, 920 (2021) (citation omitted). And here, Defendants paid Plaintiffs their contractual share of the publishing royalties for *over forty years* without any suggestion that they believed the 1977 Agreement to be terminable at will.

This is telling, as there were multiple occasions at which it would have been a natural point for Defendants to terminate the 1977 Agreement if they truly believed it to be terminable at will, such as: (1) when the band began receiving record royalties in 1981; (2) when the band renegotiated their deal with A&M Records in what was the most lucrative deal that A&M had offered a recording artist up to that date; or (3) when Margereson, Pope, or Hodgson left Supertramp.[8]  And yet, despite Hodgson's purported belief that the 1977 Agreement could be unilaterally terminated, neither he, Davies, nor Delicate Music took the opportunity to do so until 2018.

Indeed, perhaps the most obvious point at which the 1977 Agreement would have been terminated had Defendants truly believed it to be terminable at will was when Hodgson left Supertramp in 1984.  Based on trial testimony, his exit from the band was not amicable—rather, Hodgson testified that he felt that he was "forced out."  But rather than terminate the royalty payments to Plaintiffs to receive 50% of the publishing revenue moving forward, Hodgson instead *reaffirmed* his contractual obligation to Plaintiffs by merely seeking out the band's commitment that he would "continue" to receive 32.15% of *Famous Last Words*' publishing royalties and 27% of Supertramp's earlier albums' publishing royalties—in other words, what he was already entitled to under the 1977 Agreement.  Moreover, the 1984 Agreement used the term "in perpetuity" to describe Hodgson's continuing right to receive his

---

[8] When Hodgson left Supertramp, a Withdrawal Agreement was signed stating that Delicate Music's income was to be allocated "in accordance with that certain Memorandum of Agreement publishing [sic] dated as of January 18 of 1977."

contractual share of the publishing revenue allocated to him under the 1977 Agreement. This supports that the parties *mutually* understood that the allocations set forth in the 1977 Agreement were not terminable at will as Defendants suggest.

Plaintiffs point to several other examples of predispute, postcontracting behavior that is inconsistent with Hodgson's purported belief that he had the right to terminate the 1977 Agreement at will. For example, Hodgson also agreed to pay to Delicate Music any publishing revenue for the exploitation of the Supertramp songs subject to the 1977 Agreement "[i]mmediately upon receipt" in the 1984 Agreement, even though, if the 1977 Agreement were truly terminable at will, he could have retained full control over the publishing revenue by simply terminating the 1977 Agreement. Similarly, in 1988, Hodgson directed ASCAP[9] to change the allocation of publishing revenue from 50% to Hodgson and 50% to Davies to 32.15% to Hodgson and 73% to Davies, so that Hodgson could receive his contractual share of the revenue directly without going through Delicate Music, and so that Davies and Delicate Music could pay Plaintiffs from Davies' increased allocation of the publishing revenues owed to them under the 1977 Agreement. But by terminating the 1977 Agreement, Hodgson instead could have directed 50% of *all* royalties to himself. However, there is no indication that he ever contemplated doing so before 2018.

We thus conclude that the parties' predispute, postcontracting behavior is, when considered along with the

---

[9] ASCAP is the acronym for the American Society of Composers, Authors, and Publishers, an organization that collects and distributes performance royalties to member songwriters.

nature and circumstances of the contract, consistent with a mutual understanding that the 1977 Agreement was not terminable at will.

## CONCLUSION

Accordingly, we hold that the district court erred in its judicial determination that the 1977 Agreement was unilaterally terminable after a "reasonable time." We **REVERSE** and **REMAND**, with instructions to enter judgment in Plaintiffs' favor on the issue of liability, and for any further proceedings consistent with this opinion.